MANHATTAN TRUST CO. v. SIOUX CITY & N. R. CO. (HUBBARD, Intervener).

(Circuit Court, N. D. Iowa, W. D. January 15, 1895.)

1. PLEDGE—REHYPOTHECATION—REDEMPTION BY PLEDGEE.

G. and four others formed a syndicate for the construction of a railroad. The necessary money was, in part, raised upon notes of the members of the syndicate, indorsed and negotiated by the U. Trust Co., upon an agreement that the stock and bonds of the road, when issued, should be deposited with that company to secure its indorsements. Subsequently the syndicate became interested in another railroad enterprise, and it was agreed that the securities acquired in connection therewith should be held as security for all debts of the syndicate. More money being needed, G., acting on behalf of the syndicate, secured a loan from T. & Co., pledging the syndicate securities therefor. The U. Trust Co. knew of this transaction, and its secretary and treasurer, who was practically the sole manager of its affairs, placed the securities in G.'s possession, whereby he was enabled to pledge them for the new loan. Subsequently a third loan was made, for the purpose of retiring the second, in which, by an arrangement to which T. & Co. and the members of the syndicate were parties, the syndicate securities were again pledged, as the property of a corporation controlled by the members of the syndicate, to a corporation organized by T. & Co. The interest on this loan not having been paid, the securities were sold, and bought in by T. & Co. *Held*, that the U. Trust Co. had consented to the rehypothecation of the securities, and could not insist upon having them applied to its security upon its indorsements, but was entitled to redeem them upon paying the amount due to T. & Co., and to hold them, as against the members of the syndicate, as security for its indorsements.

2. BONA FIDE PURCHASER—SUBSTANCE OF TRANSACTION.

    *Held*, further, that T. & Co. acquired no rights in the securities, as purchasers in the ordinary course of business, but that the court would look through the form to the substance of the third loan, and would hold the securities subject to redemption in the hands of T. & Co.

    This was a suit by the Manhattan Trust Company against the Sioux City & Northern Railroad Company for the foreclosure of a mortgage. E. H. Hubbard, assignee of the Union Loan & Trust Company, for the benefit of creditors, intervened for the purpose of asserting certain rights of his assignor in and to the stock of the defendant company. The cause was now heard upon the intervening petition, and proofs submitted.

    John C. Coombs, Spalding, Taylor & Burgess, and Wm. Faxon, Jr. (Henry J. Taylor, of counsel), for intervener.

    Strong & Cadwalader and Henderson, Hurd, Daniels & Kiesel, for defendant.

    SHIRAS, District Judge. On the 5th day of October, 1893, the Manhattan Trust Company, a corporation created under the laws of the state of New York, filed a bill in equity in this court against the Sioux City & Northern Railroad Company, averring that it was the trustee in a mortgage executed by the railroad company, to secure an issue of bonds amounting to $1,920,000; that the mortgagor was not fulfilling the provisions of the mortgage in several particulars, and was permitting the mortgaged property to be incumbered by liens for unpaid taxes, which might shortly ripen into tax titles under sales made for the delinquent taxes, and was otherwise permitting the mortgaged property to become incumbered and wasted; and therefore it was prayed that a receiver should be appointed by the court to take possession of the mortgaged property, and operate the same to the end that the income thereof should be properly used and applied, that the delinquent taxes should be paid, and that the property should be preserved for the benefit of all interested therein.

    E. H. Hubbard, assignee for the benefit of creditors of the Union Loan & Trust Company, by leave of court, filed a petition in intervention, for the purpose of asserting the rights and equities of the Union Loan & Trust Company in and to the stock of the Sioux City & Northern Railroad Company, and, by consent of the complainant, the defendant, the Sioux City & Northern Railroad Company, and the intervener, receivers were appointed by the court, who have since had possession of the mortgaged property. The questions now submitted to the court arise upon the original and amended petition in intervention, filed by the assignee of the Union Loan & Trust Company, which are based upon the following facts: In July, 1889, D. T. Hedges, John Hornick, James E. Booge, Ed. Hakinson, and A. S. Garretson associated themselves into what is called in the evidence "a railroad syndicate," the primary purpose being to undertake the construction of the Sioux City & Northern Railroad. By a written contract dated July 3, 1889, signed by the parties above named, it was agreed that they should undertake the immediate construction of the named railroad from a point near Merrill Station, Iowa,

to a junction with the St. Paul, Minneapolis & Manitoba road, at or near Palisades, Dak.; it being further agreed that, for all money borrowed and contracts made for the building and equipment of the railway, the parties should be equally liable; that all losses and profits were to be equally divided; that, if it should be found best for one member of the syndicate to execute notes for borrowed money and contracts for materials in his own name, the same should, nevertheless, be deemed to be the obligation of all the parties to the contract; that all borrowed money was to be placed to the credit of John Hornick, trustee, with the Union Loan & Trust Company, and to be paid out on his order; that the contract thus made was to be deposited with the Union Loan & Trust Company, and was to hold good until the railroad was built and all debts connected therewith should be paid. The construction of the Sioux City & Northern Railroad being thus entered upon, the money therefor was raised by executing notes from time to time, which were indorsed by the Union Loan & Trust Company, and sold by it to various banks, the larger part of the notes being signed by John Hornick, and the remainder by the other members of the syndicate. The arrangement between the parties was that the stock and bonds of the road, as the same were issued and became the property of the syndicate, were to be deposited with the Union Loan & Trust Company, as security for the protection of the makers of the notes and of the Union Loan & Trust Company, as indorser of the paper negotiated by it; and, if sold, the proceeds were to be deposited in the Union Loan & Trust Company, to the credit of John Hornick, trustee, and to be used in the payment of the notes signed and negotiated as above stated.

Subsequently the named syndicate became interested in the enterprise carried on under the name of the Nebraska & Western Railway Company, and with the understanding that the securities and property acquired in connection therewith should be held as security for the payment of all debts created by the syndicate in the furtherance of the enterprise. Through a mortgage foreclosure, the property of the Nebraska & Western Railway Company was transferred to a new company, known as the Sioux City, O'Neill & Western. During the pendency of the foreclosure proceedings, an agreement, in writing, under date of October 1, 1891, was entered into between J. Kennedy Tod & Co. and A. S. Garretson, wherein it was recited that Garretson was the holder of $2,500,000 of the mortgage bonds of the Nebraska & Western Railway Company, of 25,000 shares of the capital stock of said company, and 7,200 shares of the capital stock of the Sioux City & Northern Railroad Company; that Garretson, on his own behalf and that of his associates, proposed to purchase the Nebraska & Western Railway at the coming foreclosure sale, and form a new corporation for the completion of that enterprise, and, for that and other purposes, Garretson needed money; that, to obtain the same, Garretson was to execute and deliver to J. Kennedy Tod & Co. his promissory notes to the number of 200 for $5,000 each, thus making an aggregate of $1,000,000, and to deposit, as security therefor, the above-named bonds and stock of the Nebraska & Western Rail-

way Company and the stock of the Sioux City & Northern Company. 'And the said Tod & Co. agreed that, within two months from the date of the agreement, they would sell the notes at par to others, or would themselves take them at par, and would at once advance to Garretson the sum of $200,000, to be used in obtaining title to the Nebraska & Western Railway property; that, upon the purchase at the coming foreclosure sale, a new corporation should be organized, to take the property, and a new mortgage thereon should be executed to the Manhattan Trust Company, to secure an issue of bonds at the rate of $18,000 per mile; and that the entire amount of bonds and one-half of the capital stock of the new company should be delivered to Tod & Co., as security in place of the bonds and stock of the Nebraska & Western Company; and that the stock of the Pacific Short-Line Bridge Company should be likewise pledged with Tod & Co., as security for the notes executed by Garretson. The foreclosure sale of the Nebraska & Western property was had at Omaha, Neb., on October 23, 1891, and was confirmed by the court, October 28, 1891; and in December, 1891, the new company, known as the Sioux City, O'Neill & Western Railway Company, was organized, and the property was conveyed to it, in consideration of the issue of $2,340,000 of first mortgage bonds and $36,000 of capital stock. A temporary printed bond for $2,340,000 was first executed pending the preparation of engraved bonds, which were subsequently issued; and, when issued, the same were delivered to Tod & Co., as security for the 200 promissory notes executed by A. S. Garretson, and which were disposed of to various parties by Tod & Co., the proceeds thereof being accounted for to Garretson, under the written agreement of October 1, 1891. Thus, there came into the hands of J. Kennedy Tod & Co., as security for the $1,000,000 of notes executed by Garretson, $2,340,000 of the first mortgage bonds of the Sioux City, O'Neill & Western Railway Company, one-half of the capital stock of that company, 7,200 shares of the capital stock of the Sioux City & Northern Railroad Company, and the stock of the Pacific Short-Line Bridge Company.

In December, 1892, a further loan was made, known as the "$1,500,-000 loan," which seems to have had for its main purpose the retirement or payment of the 200 notes executed by A. S. Garretson. The form of this transaction was substantially as follows: The Union Debenture Company, a corporation organized by Tod & Co. and their associates, entered into a written contract, under date of December 30, 1892, with Garretson, wherein it was recited that Garretson was the owner of 300 of the promissory notes of the Pacific Short-Line Bridge Company, of $5,000 each, or $1,500,000 in the aggregate, and that, as security therefor, the bridge company had pledged to Garretson 2,340 of the first mortgage bonds of the Sioux City, O'Neill & Western Railway Company, and 10,200 shares of the capital stock of the Sioux City & Northern Railroad Company, and had authorized him to transfer and pledge said stock and bonds as security for the notes of the bridge company; and it was therefore agreed that an indenture of trust should be made to J. Kennedy Tod & Co., as trustees, transferring to them, in trust, the bonds of the Sioux City, O'Neill &

Western Railway Company and the stock of the Sioux City & Northern, as security for the payment of the 300 notes of the bridge company, and that the debenture company should undertake the sale of the notes, or should purchase the same at par and accrued interest. In pursuance of this agreement, Garretson, under date of December 31, 1892, executed an indenture of trust to J. Kennedy Tod & Co., assigning to them, in trust, 2,340 bonds of the Sioux City, O'Neill & Western Railway Company, and 14,200 shares of the capital stock of the Sioux City & Northern Railroad Company, as security for the benefit of the holders of the notes of the bridge company. The execution of the notes of the bridge company was brought about through an agreement entered into between Garretson, Hedges, Hornick, and Hakinson, on the one part, and the bridge company, on the other, under date of December 31, 1892. The plan of having the notes to be issued signed in the name of the bridge company was first suggested by J. Kennedy Tod. The notes were signed and delivered to the debenture company, and the stock and bonds were delivered to J. Kennedy Tod & Co., as trustees. In the trust indenture it was provided that, in case of default in payment of any principal or interest for a period of 30 days, the trustees might, and, upon demand of the owners of one-half in amount of the outstanding notes, must, declare the whole debt due; and provision was also made for a sale at public auction of the stock and bonds, upon the written request of the holders of a majority of the outstanding notes. The interest maturing July 1, 1893, on the notes in question, was not paid, and, a majority of the note holders so requesting, the whole sum was declared to be due, and an auction sale of the securities was had on September 26, 1893, at an auction room in the city of New York, and J. Kennedy Tod & Co., as purchasing trustees, bought in the 2,340 bonds of the Sioux City, O'Neill & Western Railway Company, and 10,600 shares of the capital stock of the Sioux City & Northern Railroad Company, bidding therefor the sum of $1,000,000, which was accounted for by giving the auctioneer a receipt to the effect that payment would be made by crediting on the notes the sum bid, less expenses. These securities thus purchased are now in the possession of J. Kennedy Tod & Co.

As already stated, an intervening petition was filed in this case by the assignee of the Union Loan & Trust Company of Sioux City, Iowa, the primary purpose thereof being to settle the question of the ownership of the stock in the Sioux City & Northern Railroad Company,—a question material to the proper and final disposition of the original case, wherein a receiver had been appointed to take charge of the railway property, in order to stop waste thereof; one of the grounds for such action being that an election of directors by the stockholders could not be had, owing to the dispute over the ownership of a majority of the capital stock of the company. The ground taken in support of the claim on behalf of the Union Loan & Trust Company is that the agreement between the members of the syndicate rendered all the bonds and stock which were derived from the operations of the syndicate liable for the debts of the syndicate; and that the trust company indorsed the syndicate paper in reliance upon

this security; and that, being now liable on the syndicate paper by reason of its indorsement, it is entitled to demand the application of the securities, or the proceeds thereof, to the payment of the debts upon which it is liable.

Under the arrangement entered into between the members of the syndicate and between the syndicate and the trust company, it seems clear that the trust company, as against the members of the syndicate, is entitled to the benefit of the securities which were placed in its possession, and upon the faith of which, it may be assumed, it indorsed the syndicate paper. If these securities were now in the actual possession of the trust company, it would have the right to insist that the syndicate could not withdraw or dispose of the same, except for the purpose of paying the notes indorsed by the trust company, the proceeds of which were used in creating or procuring the securities in question. It is claimed on behalf of the trust company that it has been wrongfully deprived of the actual possession of these securities, and that it is not bound by the transaction whereby the possession thereof has been transferred to Tod & Co., as hereinbefore recited. While there is some force in this contention, still, taking the entire evidence into consideration, it is fairly deducible therefrom that the trust company parted with the possession of the securities, knowing that it was intended to rehypothecate them. It is entirely clear that E. R. Smith, the secretary and treasurer of the trust company, dealt with these securities as though he had full authority from the company so to do, and he obeyed Garretson's instructions in regard to the same without demur; and it does not appear that the trust company, or any officer thereof, ever objected to such disposition of the securities; and, furthermore, so far as the evidence in this case discloses, the general management of the business of the trust company was intrusted to Smith, with but little, if any, supervision on part of the directors or other officers of the corporation.

In the case of Martin v. Webb. 110 U. S. 7, 3 Sup. Ct. 428, the supreme court, in deciding the question of the authority of a bank cashier, held that:

"As the executive officer of the bank, he transacted its business under the orders and supervision of the board of directors. He is their arm in the management of its financial operations. While these propositions are recognized in the adjudged cases as sound, it is clear that a banking corporation may be represented by its cashier—at least, where its charter does not otherwise provide—in transactions outside of his ordinary duties, without his authority to do so being in writing, or appearing upon the record of the proceedings of the directors. His authority may be by parol, and collected from circumstances. It may be inferred from the general manner in which, for a period sufficiently long to establish a settled course of business, he has been allowed, without interference, to conduct the affairs of the bank. It may be implied from the conduct or acquiescence of the corporation, as represented by the board of directors. When, during a series of years, or in numerous business transactions, he has been permitted without objection, and in his official capacity, to pursue a particular course of conduct, it may be presumed, as between the bank and those who in good faith deal with it upon the basis of his authority to represent the corporation, that he has acted in conformity with instructions received from those who have the right to control its operations. Directors cannot, in justice to those who deal with the bank, shut their eyes to

what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. * * * That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business."

The facts in the case now before the court bring the same fairly within the rules thus enunciated by the supreme court, and justify the conclusion that it is not now open to the trust company to repu diate the acts of its secretary and treasurer in regard to these securities, by whose action, in placing the same in the possession and under the control of Garretson, the latter was enabled to repledge the same as security for further advances. On the other hand, it does not appear that the trust company intended to wholly abandon all claim to or interest in these securities. In order that the stock and bonds and the properties they represented should become valuable, it was necessary that the enterprises which they were based upon should be carried through, and this required the procurement of additional funds. To this end, Garretson undertook the negotiations with Tod & Co. and the Union Debenture Company already recited; and the fair inference from the entire evidence is that the trust company consented to the repledging of these securities, in order that further funds might be procured for carrying on the work in question; but, by so doing, it did not abandon its lien upon or equity in the securities, but only subordinated its rights to those created by the repledging of the securities. Thus, if it appeared that Garretson had repaid all the moneys borrowed on these securities, and the same had been returned to him, it would be open to the trust company to insist that the securities should be applied to the payment of the syndicate paper, indorsed by it in accordance with the original agreement of the parties.

There is nothing in the evidence which justifies the holding that the trust company has been deprived of its equitable right to these securities for the purpose indicated, unless such result has been brought about through the auction sale and purchase of the securities by Tod & Co., under the circumstances already detailed.

The determination of the rights and equities of the parties largely depends upon the transaction carried on in the name of the Pacific Short-Line Bridge Company. On behalf of the defendant, it is claimed that they and the holders of the bridge notes are entitled to protection against the equity of the trust company, on the ground that they are holders of these notes, negotiable in form, and purchased in the ordinary way of business, and, as owners of the notes, they hold the securities pledged to secure the same, free from all equities on behalf of the trust company. The evidence clearly shows that the notes in question were not purchased in the ordinary way of business, nor were they in fact issued by the bridge company in connection with the business of that company. It appears in the evidence that in December, 1892, negotiations were pending between Garretson and Tod & Co. in regard to procuring a loan of $1,500,000, the intent being to use the proceeds thereof in extinguishing the

$1,000,000 loan previously made, and evidenced by Garretson's personal notes, and the surplus was to be used by Garretson in furtherance of the Sioux City, O'Neill & Western enterprise. It seems that it was originally the purpose of Tod & Co. to base this proposed loan upon notes to be issued by the Sioux City, O'Neill & Western Railway Company; but it was found that, under the statutes of Nebraska, that company could not lawfully issue notes to the necessary amount; and on December 21, 1892, a telegram signed by Strong & Cadwalader, who were attorneys for Tod & Co., was sent to Garretson, saying:

"On examination, find railroad cannot lawfully make notes, present indebtedness being almost to limit. Tod suggests bridge company do it, and we can prepare papers on that theory. Who are officers of the bridge company? Please arrange have directors of that company meet to pass resolutions we will send, and you should have on Saturday."

Following the suggestion thus made, it was in form arranged that the bridge company, then absolutely insolvent, should ostensibly purchase from the syndicate $2,340,000 of the first mortgage bonds of the Sioux City, O'Neill & Western Railway Company, and the entire capital stock of the Sioux City & Northern Railroad Company, less 4,200 shares, and should execute, in payment therefor, its promissory notes for $1,500,000, payable to the order of A. S. Garretson; that the notes and stock and bonds should be pledged to the debenture company, which company was to advance or, secure an advance of money thereon; and the stock and bonds were to be placed in the hands of J. Kennedy Tod & Co., as trustees, to be held as security for the payment of the notes issued in the name of the bridge company.

From the evidence in this case, it clearly appears that J. Kennedy Tod & Co. and the Union Debenture Company were not only fully acquainted with the circumstances surrounding the execution of the notes of the bridge company, but in fact they were active participants in the entire transaction. The evidence shows that these notes were not issued by the bridge company in furtherance of its business, or for a consideration moving to it; and it affirmatively appears that the persons occupying the position of directors of the bridge company, when ostensibly authorizing the purchase of the railroad stock and bonds, and the issuance of $1,500,000 of promissory notes therefor, were not in fact acting on behalf of the bridge company, but were obeying the dictation of the syndicate and J. Kennedy Tod & Co., and were in truth acting in fraud of the rights of the bridge company and its stockholders. In fact, the use that was made of the bridge company's name, as the maker of the notes in question, was clearly unauthorized and fraudulent; and the formal execution of the notes in its name, and of the contract of December 31, 1892, with the syndicate, did not create any binding obligation on the company in favor of the other parties to the transaction, or those holding under them with knowledge of the facts. In the face of the facts developed in the evidence, it cannot be held that the Union Debenture Company, J. Kennedy Tod & Co., the railroad syndicate, or parties holding under them, have any enforceable rights against the bridge company,

growing out of the transactions in question, or based upon the notes or contract alleged to have been executed in the name of that company; nor can a good title to or interest in the railroad bonds and stocks in question be founded upon the title of the bridge company thereto. The use of its name in these transactions was in reality a matter of form, and was so understood by all the parties in interest; and a court of equity, in now dealing with the rights of the parties, is justified in disregarding the form given to the transaction, and should be governed by the real substance thereof, which appears to be as follows: A railroad syndicate was formed, primarily to insure the construction of the Sioux City & Northern Railroad, but subsequently it became interested in the Sioux City, O'Neill & Western Railway, the Pacific Short-Line Bridge, and perhaps other enterprises. The money needed in these operations was partly procured through the agency of the Union Loan & Trust Company, it being agreed that the securities acquired in the operations of the syndicate should be held for the common benefit and protection of the members thereof, and also for the protection of the Union Loan & Trust Company, as indorser of the syndicate paper. In the progress of time, Garretson, needing more money to meet the demands upon him, procured advances from J. Kennedy Tod & Co., and pledged the syndicate securities therefor. When the $1,500,000 loan was arranged for, the other members of the syndicate knew of the use that had been made by Garretson of the syndicate securities, and acquiesced therein, and participated in the transactions resulting in the loan of $1,500,000. The Union Loan & Trust Company consented to the pledge of the securities, and must be held to be bound thereby, in so far that it cannot assert its equities to the securities except in subordination to the equities growing out of the rehypothecation of the same. In short, the facts are that the railroad syndicate, in December, 1892, negotiated a loan through J. Kennedy Tod & Co., and, with the assent of the Union Loan & Trust Company, pledged as security therefor the stock and bonds in question. Under these circumstances, before the Union Loan & Trust Company can reclaim the securities for its protection as indorser of the syndicate paper, it must pay off the loan made on the faith of the pledge thereof. The fact that the use of the name of the bridge company may have been unauthorized does not defeat the equitable lien created by the actual pledge of the stock and bonds. Brushing aside all connection of the bridge company with the transaction, the fact remains that the syndicate procured the loan of the $1,500,000 by pledging the stock and bonds as security therefor; and the equity in the securities thus created is superior to that existing in favor of the trust company, because it is accompanied with the possession of the bonds.

It is urged on behalf of the intervener that the loan of $1,500,000 was rendered usurious by the payment of a commission of $3\frac{1}{2}$ per cent. to the debenture company for floating this loan. It is not necessary to consider at length the legal questions discussed by counsel in connection with this matter of usury. Even if it were open to the intervener to plead usury in a contract for the loan of money, to

which contract the trust company was not a party in any form, nevertheless, when the aid of a court of equity is invoked, equity must be done, and that requires the payment of the sum advanced, with interest.    Tiffany v. Institution, 18 Wall. 375; Pom. Eq. Jur. § 937.

Counsel for J. Kennedy Tod & Co., when the testimony was taken, interposed many objections to the competency of particular evidence offered, and also to the form of many of the questions put to the witnesses, and they have submitted a full brief in support of these objections.    In the view taken of the case, it has not seemed necessary to consider these objections.    The main facts of the transaction, and those upon which the conclusion of the court is based, are shown by competent evidence, not objected to, and this obviates the need of considering the exceptions at length.

The conclusion reached is that the Union Loan & Trust Company is in equity, as against the syndicate, entitled to enforce the agreement that the securities belonging to the syndicate should be applied to the payment of the syndicate notes indorsed by the trust company; that this right, however, is subordinate to the right and equity created by the pledge of these securities to J. Kennedy Tod & Co., as trustees, to secure the loan of $1,500,000; that the right of the trust company in this respect is not other nor greater than that of the syndicate; that, in seeking redemption of these securities, neither the syndicate nor the trust company can be permitted to question the validity of the varied moneyed transactions preceding the loan of the $1,500,000, and which led up thereto, as the parties in interest therein are not all parties to this suit, and cannot be made such; that to enable the syndicate, as matters now are, to reclaim these securities, it would be incumbent on them to repay the loan, principal and interest, which they obtained by pledging the securities, and the trust company is under like obligation.    The decree will therefore be to the effect that the intervener, as assignee of the Union Loan & Trust Company, is entitled to redeem the securities in question upon payment to J. Kennedy Tod & Co., as trustees, within a reasonable time, to be named in the decree, of the sum of $1,500,000, with interest at the rate of 6 per cent. per annum from December 30, 1892, payable semiannually, up to the date of payment by the intervener; that upon payment of the sum due or tender thereof by said intervener, to said Tod & Co., trustees, all claim, right, title, or equity in said securities on behalf of said J. Kennedy Tod & Co., as trustees or otherwise, shall terminate, and said securities shall be delivered to said intervener, all proper and necessary transfers being executed by said Tod & Co. to fully transfer said securities to said assignee; that, if said intervener shall fail or refuse to pay or tender the amount necessary to redeem the securities, then the intervening petition shall be dismissed; that the costs shall be equally divided; and that the court shall have and retain jurisdiction for the purpose of making all further orders and decrees necessary to enforce and protect the rights of the parties, as established by the present decree.