## HUBBARD, Assignee, *v.* TOD.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 24. Argued April 22, 25, 1898. — Decided October 17, 1898.

On the hearing of a case, brought by certiorari from a Circuit Court of Appeals on petition of one of the parties, in which the judgment of that court is made otherwise final, this court will pass only upon the errors assigned by the petitioner, and does not feel at liberty to decide whether there was error in the decree below, of which the other party might have complained.

Under the circumstances disclosed in the statement of the case and in the opinion of the court in this case, the Union Trust Company cannot be allowed to set up its alleged title to the stock and bonds in controversy, as against third parties taking in good faith and without notice, and the same principle is applicable to its assignee, and to creditors seeking to enforce rights in his name; and, so far as this case is concerned, there is nothing to the contrary in the statute of Iowa regulating assignments for the benefit of creditors, as expounded by the Supreme Court of that State.

This court concurs in the conclusion reached by the Circuit Court and the Circuit Court of Appeals on the fact that the respondents' right to the securities was superior to that asserted by the petitioner.

The New York statutes against usury cannot be interposed by a corporation, or pleaded by endorsers of its paper.

THE Manhattan Trust Company of New York filed its bill, on September 28, 1893, in the Circuit Court of the United States for the Northern District of Iowa, against the Sioux City & Northern Railroad Company of Iowa, praying for

the appointment of a receiver to take possession of the railroad and its properties and to operate and preserve the same, under and by virtue of the terms of a trust deed made and executed by the Sioux City & Northern Railroad Company to the Manhattan Trust Company, January 1, 1890, to secure an issue of bonds to the amount of $1,920,000.

October 5, 1893, receivers were appointed, and on the same day E. H. Hubbard, as assignee of the Union Loan & Trust Company, a corporation of Iowa, filed in said cause an intervening petition against the members of the banking firm of J. Kennedy Tod & Co. of New York, praying in respect of 10,600 shares of the capital stock of the Sioux City & Northern Railroad Company, and $2,340,000 in first mortgage bonds of the Sioux City, O'Neill & Western Railway Company, a corporation of Nebraska, held by J. Kennedy Tod & Co., an injunction against the disposition thereof; an accounting of what sums J. Kennedy Tod & Co. had advanced in good faith on said securities; and the surrender by them of the collateral to the intervening petitioner on the ascertainment of the sums so advanced and constituting a lien thereon.

J. Kennedy Tod, W. S. Tod and Robert S. Tod, composing the firm of Tod & Co. objected to the jurisdiction, but answered November 16, 1893, and about the first of January, 1894, petitioner filed an amended petition, to which defendants filed a supplemental answer, and petitioner, a replication.

The intervening petition and amendments averred that the Union Loan & Trust Company was a corporation of the State of Iowa, organized in the year 1885, and thereafter engaged in carrying on a loan and trust business up to and until April 25, 1893, when it made a general assignment of all its property and assets to E. H. Hubbard of Sioux City, Iowa.

That on July 3, 1889, A. S. Garretson, John Hornick, J. D. Booge, Ed. Haakinson and D. T. Hedges entered into an agreement in writing, referred to as a railroad syndicate agreement, for the construction of the Sioux City & Northern Railroad, which construction was proceeded with, and from time to time the individual members of the syndicate executed and

delivered their respective notes to the Union Loan & Trust
Company in various sums, which notes that company sold to
various bankers and brokers throughout the United States;
that there existed an understanding or agreement between the
syndicate and the company that the syndicate should deposit
with the company as collateral security for said notes the
stock and bonds of the Sioux City & Northern Railway
Company when issued; that the syndicate caused the corpora-
tion to issue the mortgage described in the original bill; and
that the bonds and stock of the corporation were held by the
company "as collateral security for the payment of the
notes with the proceeds whereof the said railroad has been
constructed and equipped as aforesaid." ·

That afterwards the syndicate lent its aid to the Wyoming
Pacific Improvement Company, a Wyoming corporation en-
gaged in the construction of the Nebraska & Western Rail-
road, a line of road extending westward from Sioux City to
the town of O'Neill, in the State of Nebraska, and that said
syndicate also extended its aid and assistance to other corpo-
rations in and about Sioux City, such as the Pacific Short
Line Bridge Company, the Union Stock-Yards Company, the
Sioux City Terminal Railroad & Warehouse Company, and
the Sioux City Dressed Beef & Canning Company, with a
like understanding between the syndicate and the Union Loan
& Trust Company that the securities of the respective com-
panies coming into the possession of the syndicate should be
deposited with the Union Loan & Trust Company as collat-
eral to the notes which the members of the syndicate might
give to that company on behalf of the enterprises respectively.

And also that the syndicate organized the corporation
known as the Pacific Short Line Bridge Company to con-
struct a bridge across the Missouri River at Sioux City for
the purpose of connecting said railroads, the stock of said
company to belong to the Nebraska Company.

It was further averred that the syndicate acquired the
ownership of all the bonds of the Nebraska & Western Rail-
way Company, and that they became subject to the lien of
the Union Loan & Trust Company; yet that A. S. Garretson,

on or about October 1, 1891, without any apparent record or other authority from the Union Loan & Trust Company, caused all of the Nebraska & Western bonds and 7200 shares of Sioux City & Northern Railroad stock to be transferred to Tod & Co. as security for a loan of one million dollars, but that Tod & Co. were chargeable with notice of Garretson's want of authority.

That the Nebraska & Western Railway was built by the Wyoming & Pacific Improvement Company, which was practically owned and controlled by the Manhattan Trust Company, and that the Improvement Company received stock and bonds of the Nebraska & Western Company, and delivered them to the Manhattan Trust Company, by which they were pledged, or held in trust, as security for loans negotiated and advanced by it to the Improvement Company, including a loan of $500,000 by Belmont & Co., all of which were outstanding when, on November 1, 1890, the Improvement Company collapsed, to the knowledge of Tod & Co.

That to relieve itself from impending loss, the Manhattan Trust Company, by untruthful representations as to the amount of the indebtedness of the Nebraska & Western Railway Company, induced Garretson to purchase said loans; that Garretson thereupon deposited $750,000 of the Sioux City & Northern bonds with the Manhattan Trust Company as security for relief of the maturing obligations to Belmont & Co.; and that about the same time Tod & Co. began to make advances to Garretson on the security of the Nebraska and Western bonds; that Garretson was obliged to sell all the Sioux City and Northern bonds at a sacrifice price of seventy-five per cent, and to pledge all the Nebraska & Western bonds and half of the Sioux City & Northern stock substantially for the value of the purchase price of the Nebraska & Western bonds.

That the mortgage covering said bonds was foreclosed and the property conveyed to a new corporation called the Sioux City, O'Neill & Western Railway Company, in exchange for the issue of $2,340,000 of first mortgage bonds, and 36,000 shares of stock; and that in the latter part of 1892, or early

in 1893, Garretson, without any apparent record or other authority from the Union Loan & Trust Company, caused all of the bonds of the Sioux City, O'Neill & Western Railway Company, and substantially all of the stock of the Sioux City & Northern Railroad Company, to be vested in the Pacific Short Line Bridge Company, and the notes of the latter company, to the amount of $1,500,000, to be given to himself, and the payment thereof to be secured by the pledge of all said bonds and stock, and transferred the notes and securities to J. Kennedy Tod & Co., who, acting as trustees, but chargeable with notice, negotiated or bought the greater part of the said notes for different holders or purchasers thereof, $500,000 being taken by the Great Northern Railway, which desired to acquire the Sioux City & Northern Railroad, and with which Tod & Co. were allied.

That after the failure of the Union Loan & Trust Company, a committee of its creditors, Tod & Co. having advertised the sale of the collateral pursuant to the terms of the $1,500,000 loan, there having been default in payment of interest for thirty days, offered to pay the overdue interest on certain conditions, which were refused, and the collateral was sold and bought in by Tod & Co. for $1,000,000.

The petition and amended petition contained an averment that petitioner, "as assignee of said Union Loan & Trust Company, is entitled to the immediate surrender of all and singular of said securities by said J. Kennedy Tod & Co. to your petitioner without any payment of principal or interest upon said alleged loan, or any other consideration whatsoever."

The prayer of the amended petition was: That Tod & Co. surrender to petitioner, without any terms or conditions, the collateral held by them as aforesaid, and that they be enjoined from selling or disposing of the same; for an accounting of sums advanced by Tod & Co. in good faith and without notice on account of the securities, and the disposition made by them of any other collateral held by them under the loan agreement of December 31, 1892; the surrender of the certificates to the petitioner upon an accounting, and the

ascertainment of what sums, if any, constituted a lien there-on; and the appointment of a receiver *pendente lite.*

The answers of Tod & Co. traversed the allegations of the petition and amended petition on which petitioner based his claim to the securities, and particularly denied all charges of fraud, want of good faith or notice; and set forth at length the transactions in respect of said securities on which they claimed the title thereto or right to hold the same. After much of the testimony had been taken petitioner moved for leave to further amend his petition, which motion was held over to the hearing.

The case was heard on the merits, and, in the final decree, leave to further amend was granted. This second amended petition made the Manhattan Trust Company a party, and averred among other things, that the loan of one million dollars and the loan of one million and a half were usurious, and prayed that each be declared void, and that the securities be surrendered to petitioner free and clear of any claim, right, interest or lien of Kennedy Tod & Co.

The evidence may be sufficiently summarized as follows:

I. The Union Loan & Trust Company was organized in 1885 with a capital stock of $100,000, which was afterwards increased to $1,000,000. The purposes of its incorporation, as stated in its certificate of organization, were the loaning of money on real and personal security; the purchase and sale of securities; the negotiation of loans; and the execution of trusts; but the company was not to "purchase, nor loan its funds on the securities of any railroad company." It had a board of five directors, a president, vice president and secretary, and by its by-laws a committee of three members on applications for loans was provided for.

November 2, 1885, George L. Joy was elected president, A. S. Garretson, vice president, and E. R. Smith, secretary, subsequently also made treasurer, and these three persons were appointed the committee on loans. They continued to hold these offices and to constitute that committee up to and until April 24, 1893, when the company made an assignment to E. H. Hubbard.

The practical management of the company's affairs was

left to E. R. Smith, secretary and treasurer, and he accepted, endorsed and discounted notes as if he were solely in charge of the business.

When individual members of the syndicate presented notes to the company, Smith accepted the notes without collateral, but claimed that this was on the understanding that securities were to be or would be thereafter deposited; and when securities, whether bonds or stock, did come to the hands of Smith as secretary and treasurer, he parted with them to Garretson, or transmitted them as requested by Garretson, constantly recognizing Garretson's right to sell or rehypothecate the same. Garretson testified to the right of the syndicate to sell or pledge the securities on the market; and its financial management was entrusted to him.

The so-called Railroad Syndicate agreement was entered into July 3, 1889, by A. S. Garretson, John Hornick, J. E. Booge, Ed. Haakinson and D. T. Hedges, for the purpose of building and equipping the Sioux City & Northern Railroad, and provided that all money borrowed and contracts made for the building and equipment of the road should be borne equally by the parties; that where notes were executed by one for the purposes expressed, each should be equally liable therefor; that all money borrowed should be placed to the credit of John Hornick, trustee, at the office of the Union Loan & Trust Company; and that the contract should continue until the railroad should be completed and its debts paid; and be lodged with the company.

The agreement contained no provision that the money borrowed for the uses of the copartnership should be borrowed from or through the Union Loan & Trust Company; nor any stipulation for the depositing with that company of the stock and bonds of the Sioux City & Northern Railroad, as security for any money the syndicate might borrow.

It appeared that when the Union Loan & Trust Company desired to rediscount or sell notes, it sent out a circular offering them at a considerable discount, and reciting "in every case we hold good and sufficient security from the maker"; but it did not appear that the holders of notes, the creditors repre-

sented by the assignee, took them on the faith of any pledge
of the securities in question. Nor was any reference thereto
made in the notes themselves. The understanding between
the syndicate and the Union Loan & Trust Company, that
railroad securities should be deposited to secure syndicate
paper, rested on conversations between the parties, and did not
involve the liberty of the syndicate to borrow elsewhere; nor
did the understanding permit securities held for moneys ad-
vanced to one enterprise to be held as security for any other.

The Sioux City & Northern Railroad was constructed by
the syndicate, some of the money being raised on notes of its
members, which were discounted by the Union Loan & Trust
Company, the proceeds credited to Hornick, trustee, and
drawn against as provided in the agreement.

The road was completed in January, 1890, and the syndicate
acquired its first mortgage bonds for $1,920,000, secured by
mortgage to the Manhattan Trust Company as trustee, and
its capital stock of about 14,400 shares. None of the shares
of this stock ever stood in the name of the Union Loan &
Trust Company, nor did any of the bonds; nor did the books
of the company contain entries referring to the collateral in
controversy as pledged to secure syndicate paper or the com-
pany's indorsement thereof.

The bonds came into the custody of the Union Loan &
Trust Company before they were certified by the Manhattan
Trust Company, and on February 24, 1890, Smith, secretary,
transmitted them to the Manhattan Trust Company to be cer-
tified, but did not request that they should be returned. On
the same day Garretson directed the Manhattan Trust Com-
pany to certify the bonds and hold them subject to his order;
and on March 12, 1890, Smith, secretary, directed the Man-
hattan Trust Company to issue its receipt for said bonds to
A. S. Garretson, individually, which was accordingly done.

Efforts to sell the bonds were made, and, in furtherance
thereof, August 26, 1890, Garretson directed the Manhattan
Trust Company to ship the bonds to the Boston Safe Deposit
and Trust Company, Boston, to be held subject to the order
of F. V. Parker & Co., and the bonds were so shipped.

Subsequently, Garretson hypothecated portions of these bonds to secure his own notes given for loans made for the purpose of acquiring control of the Nebraska & Western Railroad, forming part of the "Pacific Short Line" enterprise, promoted to build a road from a point on the Missouri River opposite Sioux City westward to Ogden, Utah.

In the latter part of December, 1890, or early in January, 1891, Garretson and Hedges offered the Sioux City & Northern bonds to Tod & Co. at 90 cents, but no purchase was made, Tod & Co. offering 66½. A few weeks later, Tod & Co. were again applied to and they purchased the bonds at 75 cents. The evidence tended to show that out of the proceeds Garretson's notes to the aggregate of $690,000, secured by 920 Sioux City & Northern bonds, were taken up, and $750,000 were paid over to the Union Loan & Trust Company and credited to the syndicate.

II. The Nebraska & Western Railway Company was organized in 1889, and on the first day of July of that year made and executed its mortgage to the Manhattan Trust Company to secure its issue of bonds to the amount of $2,583,000.

It then contracted with the Wyoming Pacific Improvement Company to construct and equip the road, which was to receive therefor the bonds of the railway company, to be delivered by the Manhattan Trust Company as issued and certified to by it, and in this way the Improvement Company became the owner of the bonds. On February 1, 1890, the Improvement Company entered into an agreement with the Manhattan Trust Company, under which the latter procured for the former, on its notes, loans to the amount of $1,050,000, secured by bonds held in trust in the ratio of two dollars in bonds to one dollar in money loaned. At the same time an underwriter's agreement was entered into between the Improvement Company and the subscribers thereto, by which if the loans were not paid the bonds were to be taken at fifty cents on the dollar.

Of this loan Belmont & Co. took $500,000, and Garretson and Hedges $125,000 each.

Garretson, Hornick and Booge had previously become sub

scribers to the enterprise to the extent of $100,000 for certificates of the Improvement Company, and they, and Hedges and Haakinson, executed an agreement February 15, 1890, agreeing that, for the purpose of securing the " construction of the Pacific Short Line from Sioux City westward to O'Neill," they would raise $350,000, $250,000 to be loaned the Improvement Company on the security of $500,000 first mortgage bonds of the Nebraska & Western Railway Co., held by the Manhattan Trust Company, and $100,000 certificates of the Improvement Company to be assigned to the syndicate by the original subscribers.

The Manhattan Trust Company held $2,100,000 of the Nebraska & Western bonds to secure the $1,050,000 loan and, subsequently, $483,000 more to secure other loans.

About November 1, 1890, it became necessary to provide for the payment of the loan by Belmont & Co.

On that date Garretson borrowed through the Manhattan Trust Company $500,000 on his individual notes secured by $750,000 Sioux City & Northern bonds, and took up the Belmont loan of $500,000. He at the same time negotiated with the officers of the Manhattan Trust Company touching other loans to the Improvement Company under the underwriter's agreement to the effect that the Manhattan Trust Company should cause said loans to be renewed or placed elsewhere, and that the Nebraska & Western bonds in possession of the Manhattan Trust Company should be used as collateral.

And, January 28, 1891, Garretson entered into a written agreement with the Manhattan Trust Company for the taking up of the then outstanding notes and receiving the collateral held as security therefor.

Among the transactions, Garretson borrowed in February $190,000 secured by 170 Sioux City & Northern bonds, and the equity in the 750 bonds held to secure the $500,000 loan. These loans were paid out of the proceeds of the sale of the whole issue of the Sioux City & Northern bonds, as before stated.

The testimony of Garretson was relied on to sustain the

charge that the Manhattan Trust Company perpetrated a fraud on him at the time he entered into negotiations to assume or take up the obligations of the Improvement Company, in the acquisition of the Nebraska & Western road, in that it misrepresented the amount of that company's indebtedness. The officers of the Manhattan Trust Company positively denied any such misrepresentation; and the eighth paragraph of Garretson's contract with the Manhattan Trust Company of January 28, 1891, declared: " This agreement and the settlement herein made is in full adjustment and settlement of all questions heretofore arising between the parties hereto, in reference to the said Improvement Company or the construction of the Nebraska & Western Railway, and the first party agrees that his note for $500,000 heretofore given on taking up certain loans shall be paid at or before maturity." The evidence did not show that if there had been any misrepresentation, Tod & Co. had any knowledge in fact thereof, though at one time a member of the firm, now deceased, was a director of that Trust Company, and its counsel was also Tod & Co.'s.

After Garretson had become the holder of the obligations of the Improvement Company and the Nebraska & Western bonds, he caused the bonds to be sold on May 27, 1891, and June 24, 1891, pursuant to a demand made on the Manhattan Trust Company as trustee and to notice given, and at the sale purchased all the bonds of the Nebraska & Western Railway Company.

In June, 1891, Tod & Co. loaned Garretson $75,000 on $200,000 Nebraska & Western bonds as collateral.

III. October 1, 1891, Garretson entered into a contract with Tod & Co. to borrow one million dollars, which recited that Garretson was the holder of $2,500,000, or thereabouts, of Nebraska & Western bonds; of 25,000 shares of the stock of the Nebraska & Western Railway Company, and of 7200 shares of the stock of the Sioux City & Northern Railroad Company; that proceedings were pending for the foreclosure and sale of the Nebraska & Western Railway; and that Garretson desired to borrow money, purchase the road, form a new corporation, and obtain a new issue of bonds and stock;

and Tod & Co. agreed to make or procure him a loan on these terms: Garretson to deliver to Tod & Co. his two hundred promissory notes of $5000 each, dated October 1, 1891, and payable on demand, and to deposit as security for the equal and common benefit of all who should become holders thereof the Nebraska & Western bonds, the shares of Nebraska & Western stock, and the shares of Sioux City & Northern stock; Tod & Co. to procure the sale of the notes at par, and to advance thereon at once $200,000, if required in obtaining title, the collateral to be held by Tod & Co. for the equal benefit of the holders of the notes; on the reorganization of the Nebraska & Western Railway Company under the foreclosure, a new mortgage to be executed to the Manhattan Trust Company to secure a new issue of bonds at the rate of $18,000 per mile, and the whole amount of such issue, $2,340,000 and one half of the capital stock of the new company to be delivered to Tod & Co. in the place of the Nebraska & Western bonds and stock. If the Nebraska & Western bonds were required to be deposited in court, the road was to be purchased in the name of trustees, and until the new corporation was formed and new bonds and stock delivered, no more than $600,000 was to be paid over to Garretson, the balance to remain to his credit with the banking company.

The new bonds were also to be further secured by all the stock of the Pacific Bridge Company except such part not exceeding fifty shares as should be necessary to qualify directors. The note holders were also given certain options, and Tod & Co. were to receive one per cent commission for their services.

The notes representing this million dollar loan were not executed October 1, 1891, but were thereafter prepared and sent to Garretson at Sioux City, were there executed by him, and were received by Tod & Co. October 26, Garretson being credited with the principal and twenty-five days' interest.

One million of the Nebraska & Western bonds were delivered to Tod & Co. October 19, 1891, $800,000 by the Manhattan Trust Company and $200,000 by Tod & Co.'s cashier, which had been pledged to them to secure the loan of $75,000,

and these bonds were sent that day to Wickersham, Tod & Co.'s attorney and agent at Omaha, to be used in the purchase under the foreclosure. One hundred and fifty thousand dollars of the bonds had been delivered to the St. Charles Car Company, and were received by Tod & Co. October 27, and forwarded to Wickersham that day.

Of the remainder of the bonds, 500 were held by the Manhattan Trust Company as collateral to the $250,000 subscribed by Garretson and Hedges to the underwriter's agreement, and had been shipped to the Union Loan & Trust Company by the Manhattan Trust Company by direction of Garretson, December 2, 1890.

And $933,000, which had been lodged in Tod & Co.'s custody by Garretson, had been sent to the company in August, 1891, on his instructions, which contained nothing to indicate that the Union Loan & Trust Company had any claim of lien thereon, or right thereto, while Tod & Co. testified that they supposed they were transmitted as a mere matter of safety deposit.

These bonds for $1,433,000 were sent to Garretson at Omaha by the Union Loan & Trust Company, and delivered by him to Wickersham.

The railroad was sold under the foreclosure decree October 23, 1891, and bought in by Garretson and Wickersham as trustees for the holders of the first mortgage bonds of the Nebraska & Western Railway Company, and on October 30 the entire issue, $2,583,000, was deposited by Wickersham with the clerk of the court, and the sale thereupon confirmed.

The road was reorganized under the name of the Sioux City, O'Neill & Western Railway Company, and Wickersham and Garretson as trustees conveyed the property to the new company in exchange for the issue of the bonds and stock.

Pending the issue of the engraved bonds of the Sioux City, O'Neill & Western Railway Company, a temporary bond was issued and delivered to Tod & Co., and afterwards exchanged for the engraved bonds.

All the bonds of the company were thus pledged to secure the $1,000,000 loan with the full knowledge and participation

of Garretson, and of Smith, secretary and treasurer of the Union Loan & Trust Company.

Some of the notes issued under this loan were sold to various parties and some retained by Tod & Co.

It having been intimated that payment of the one million dollar loan would be required, Garretson applied to Tod & Co. for the negotiation of a loan of $1,500,000. It was contemplated that the notes of the Sioux City, O'Neill & Western Railway Company for that amount should be given, to be secured by the bonds of that company and the stock of the Sioux City & Northern Company, then in pledge with Tod & Co. But Tod & Co. were advised by their counsel that the railway company was not authorized under the law of Nebraska to contract so large an indebtedness in excess of its outstanding bonds, and thereupon it was suggested that Garretson should sell the securities to the Pacific Short Line Bridge Company and receive back the notes of that company for $1,500,000, to be secured by a pledge of said securities, and that Tod & Co. should negotiate a sale of these notes on the strength of the securities thus pledged.

The Pacific Short Line Bridge Company was a corporation of Iowa, organized for the purpose of constructing a bridge across the Missouri River at Sioux City, as a part of the Nebraska and Western enterprise. Its stock was divided into 20,000 shares of $100 each, which were issued November 13, 1891, in four certificates of 5000 shares each, in the name of "A. S. Garretson, trustee," and these certificates were delivered by Garretson, November 19, 1891, to Tod & Co., who, on December 14, delivered them to the Manhattan Trust Company as trustee under the mortgage of the Sioux City, O'Neill & Western Railway Company, pursuant to the million dollar loan agreement of October 1, 1891. The Bridge Company had executed a mortgage to secure $1,500,000 of bonds, but of these only $500,000 had been certified by the trustee, and it did not affirmatively appear that any had been negotiated. Garretson testified that the purpose of the $1,500,000 loan was to take up the million dollar loan and to get "additional funds with which to carry on the construction of the bridge to a

point where we could get money from the bonds of the bridge to complete it."

December 26, 1892, the Pacific Short Line Bridge Company, at a meeting of its board of directors, passed a series of resolutions by which it agreed to purchase the bonds of the Sioux City, O'Neill & Western Railway Company, and 10,200 shares of the capital stock of the Sioux City & Northern Company, and to give therefor its promissory notes in the sum of $1,500,000 to the order of Garretson, dated December 30, 1892, and to pledge said bonds and stock to Garretson as security. Accordingly on December 31, 1892, a contract was entered into between Garretson, Hedges, Hornick and Haakinson (the remaining member of the syndicate, Booge, having failed and dropped out), and the Pacific Short Line Bridge Company, by which the Bridge Company purchased the securities and agreed to give its notes therefor, payable to Garretson's order, February 1, March 1 and April 1, 1894, bearing date December 30, 1892, to be forwarded to Tod & Co. to be delivered to Garretson or his order, or held by Tod & Co. as trustees to secure the payment of said notes. The notes were to provide, and when issued did provide, that on thirty days' default, in payment of interest, the principal was to become due and payable at the option of Tod & Co., on behalf of the holders, to be exercised on the written request of a majority.

Tod & Co. negotiated a sale of the notes through the Union Debenture Company, a corporation of the State of New Jersey, which was evidenced by a contract under date of December 30, 1892, between Garretson and that company, which recited that the notes were to be secured by the 2340 Sioux City, O'Neill & Western bonds and 14,200 shares of the Sioux City & Northern stock, by an indenture of trust with Tod & Co. December 31, Garretson entered into this indenture of trust whereby he pledged the said bonds and stock to Tod & Co. as trustees for the equal and pro rata benefit and security of all the holders of the notes, it being provided that if default should be made in the payment of the principal or interest of any of the notes, the trustee, on request, might de-

·clare the principal and interest due and sell the bonds and stock at public auction, and that the holders might appoint a purchasing trustee, in whom, if he bought at the sale, the right and title to the bonds and stock in trust for all the note holders in proportion to the amounts due them respectively.

The note holders were given certain options, and Garretson agreed to pay the Debenture Company three and a half per cent commission.

As already set forth, Tod & Co. then held the 2340 bonds and 7200 shares of Sioux City & Northern stock. Of the remaining 7000 shares of this stock to be pledged under the agreement, 6190 shares were delivered to Tod & Co. by Garretson in December, 1892, in New York, and certificates for 1000 shares were sent to Tod & Co. by Smith, secretary, January 16, 1893. All these shares were transferred by members of the syndicate. In March, 1893, Tod & Co., as authorized by the indenture of trust, at the request of Garretson, released and delivered to the treasurer of the Great Northern Railroad Company 3600 shares, which Garretson had sold to that company for $350,000 in cash, all of which was received by Garretson. W. S. Tod testified that his firm supposed the proceeds of this sale were to be applied towards the construction of the bridge, and the evidence tended to show that the money was paid over to the Union Loan & Trust Company to be applied in payment of notes of the syndicate.

The notes for the $1,500,000 were executed and endorsed by Garretson and the transaction closed January 30, 1893, and on that date the Union· Debenture Company turned over to Tod & Co. $1,507,500, being principal with accrued interest, and thereupon Tod & Co. paid off the million dollar loan with accrued interest, $1,004,833.33. They thus released the $2,340,000 Sioux City, O'Neill & Western bonds, the 18,000 shares of Sioux City & Western Stock, and 7200 shares of Sioux City & Northern stock, and delivered to themselves as trustees under the indenture of trust the bonds, 10,200 shares of Sioux City & Northern stock and also 4000 of the latter stock; and certified and delivered the bridge notes to the Debenture Company.

These notes contained the provision that they might be declared due on default in payment of interest or principal, and that they were secured by the indenture of trust of December 31, 1892, and the deposit of the bonds and stock as collateral.

The Union Debenture Company was a corporation of New Jersey, with a capital stock of $300,000 and over $800,000 of assets, and had issued and had outstanding $500,000 of twenty year debenture bonds, which had been sold mainly in England, Scotland and Holland. Tod & Co. owned one third of the capital stock, and the business of the company was transacted through Tod & Co. as brokers. The notes in question, except about $40,000 retained by the Debenture Company, were sold by them as brokers to various persons, including $590,000 to parties abroad, and $500,000 to the Great Northern Railway Company, but Tod & Co. took no part of the loan.

The commission of three and one half per cent, $52,500, was paid to the Debenture Company by Tod & Co.

The remainder of the proceeds of the $1,500,000 loan, after the discharge of the million dollar loan, the payment of the commissions, and of a temporary loan of $30,000 to Garretson, was paid over on Garretson's drafts, to the Union Loan & Trust Company, to be applied to the payment of bridge estimates and to the credit of Hornick, trustee. About $200,000 was applied on bridge account.

All the members of the syndicate were parties to the agreement by which the bonds and stock in controversy were sold to the Bridge Company and knew of the use Garretson proposed to make of the notes and securities. They did not repudiate the transaction, and never made any complaint or gave any notice to Tod & Co. that Garretson was wrongfully pledging the collateral. Tod & Co. rendered full accounts of the two loans to Garretson, which were sent by him to Smith as they were received.

Garretson was a prominent man in banking, financial and railroad circles when he began his dealings with Tod & Co., and continued to be so until 1893. He had been, or was, an officer of many business corporations or companies; and one

of the chief promoters and builders of the Sioux City & Northern Railway, and organizers of the Union Loan & Trust Company. He was highly recommended to Tod & Co. by the president of the Great Northern Railway Company, of which J. Kennedy Tod was a director. Mr. Tod stated that they believed during the negotiations between their firm and Garretson that he was a man of large wealth.

The Tods testified that they knew nothing of the dealings between the Manhattan Trust Company and the Improvement Company, or of the loan transactions of the Improvement Company, and had no connection therewith; that they had no knowledge or notice of any claims of the Union Loan & Trust Company to these securities at or before the time they were pledged to secure either the loan for $1,000,000, or the loan for $1,500,000, and the first information they had of any such claim was after default had been made in the payment of interest on the latter loan.

The interest on the notes was payable July 1, 1893, and January 1, 1894, and the interest due July 1, 1893, not having been paid, and the default having continued for thirty days, Tod & Co. on a request of a majority of the note holders declared the principal due, and advertised the securities for sale on September 19, in accordance with the indenture of trust, due notice being given, which sale was adjourned to September 26, at the instance of the creditors of the Union Loan & Trust Company, when the sale took place, and Tod & Co. bought the securities as purchasing trustees, thereto duly appointed, and held the same for the benefit of the holders of the notes. Certificates were issued by Tod & Co. as such purchasing trustees that they so held the securities and that each of the note holders was entitled to a three hundredth part interest for every $5000 note deposited.

After the interest had defaulted Tod & Co. were interviewed on behalf of some of the creditors of the Union Loan & Trust Company, and an offer to pay the defaulted interest was made on condition that such creditors should be put in control of the board of directors of the Sioux City & Northern Railroad Company, but with this condition Tod & Co. were with-

out authority to comply, and the creditors' committee declined to pay. No money was tendered.

According to the evidence of the Tods it was then, for the first time, that Tod & Co. received any intimation that their right to hold the securities was questioned by the Union Loan & Trust Company or its creditors.

The Circuit Court entered a final decree authorizing the redemption of the securities by the intervenor on payment to Tod & Co., as trustees, of the sum of $1,500,000, with interest thereon from December 30, 1892, computed with semiannual rests, to the date of payment.

The opinion is reported 65 Fed. Rep. 559, and it appears therefrom that District Judge Shiras, by whom the cause was heard, held that the transactions prior to the million and a half loan could not be passed on, but that the inquiry at issue was to be determined by considering the contracts under which Tod & Co. obtained possession of and claimed title to the 10,600 shares of Sioux City & Northern stock, and the $2,340,000 of Sioux City, O'Neill & Western bonds held by them.

After a brief review of the formation of the syndicate and its dealings with the Union Loan & Trust Company, the conclusion was drawn " that the Trust Company as against the members of the syndicate is entitled to the benefit of the securities which were placed in its possession, and upon the faith of which it may be assumed it endorsed the syndicate paper," but that it was fairly deducible from the evidence that "the Trust Company parted with the possession of the securities, knowing that it was intended to re-hypothecate them," and that "it is not now open to the Trust Company to repudiate the acts of its secretary and treasurer in regard to these securities, by whose action in placing the same in the possession and under the control of Garretson the latter was enabled to repledge the same as security for further advances." That "the fair inference from the entire evidence is that the Trust Company consented to the repledging of these securities, in order that further funds might be procured for carrying on the work in question, but by so doing it did not abandon its

lien upon or equity in the securities, but only subordinated its rights to those created by the repledging of the securities."

That the sale of the securities by Tod & Co. under the provisions of the trust agreement of December 31, 1892, did not divest the Trust Company, or its assignee, of the junior lien on the securities, and that its right to redeem remained because the $1,500,000 of notes were not purchased in the ordinary course of business, nor in fact issued by the Bridge Company in connection with its business, but made at the dictation of the syndicate on the suggestion of Tod & Co., and operated as a fraud on the Bridge Company; that the use of its name was in reality a matter of form merely, and was so understood; and that the transaction must be considered as a loan to the syndicate, secured by a pledge of the collateral, which lien was superior to that existing in favor of the Trust Company.

The suggestion as to usury was dismissed on the ground that in any view equity required the payment of the sums advanced with interest, and no offer to do this was made by the intervenor.

From the decree the intervenor prosecuted an appeal to the Circuit Court of Appeals for the Eighth Circuit, assigning as error, in substance, that the Circuit Court erred in not finding that intervenor had a prior lien; that the securities were wrongfully taken from the Union Loan & Trust Company, and that defendants were not bona fide holders and took with notice; that the loans were usurious and void, and defendants, therefore, unable to hold the securities as against the intervenor.

Defendants also appealed from the decree, assigning as error the failure of the court to sustain objections to certain evidence; the allowance in the final decree of leave to intervenor to file his second amended petition; and the award of redemption.

The cause was heard in the Court of Appeals by two Circuit Judges, and the decree affirmed by an equal division; but on a petition for rehearing by the intervenor an opinion was filed from which it appeared that both judges were agreed

that appellee's lien on the securities was paramount to any claim of intervenor, but that they were divided on the question whether or not the right of redemption was cut off by the auction sale under the loan agreement.

The intervenor then applied to this court for a writ of certiorari, which was granted.

*Mr. Henry J. Taylor* and *Mr. John C. Coombs* for Hubbard, Assignee. *Mr. William Faxon, Jr.,* was on the brief.

*Mr. John L. Webster* and *Mr. George W. Wickersham* for Tod and others. *Mr. Francis B. Daniels* was on the brief.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the Court.

It is provided by the judiciary act of March 3, 1891, c. 517, § 6, 26 Stat. 826, 828, that any case in which the judgments or decrees of the Circuit Court of Appeals are thereby made final, may be required, by certiorari or otherwise, to be certified to this court "for its review and determination, with the same power and authority in the case as if it had been carried by appeal or writ of error to the Supreme Court."

This case belongs to the class of cases in which the decree of the Circuit Court of Appeals is made final by the statute, and having been brought up by certiorari on the application of petitioner below, is pending before us as if on his appeal.

And as respondents did not apply for certiorari, we shall confine our consideration of the case to the examination of errors assigned by petitioner.

These errors as assigned in the brief of counsel are, in short, that the Circuit Court erred, (1) in not establishing the priority of petitioner's lien or right in and to the securities; (2) in subordinating that lien or right, and decreeing foreclosure unless payment was made as prescribed; (3) in not entering a decree giving priority to petitioner because respondents set up absolute title by purchase, which was not sustained by the court; (4) in not restraining respondents by injunction and not ordering the surrender of the securities to petitioner.

The supposed errors in decreeing foreclosure, and that respondents were entitled to hold as pledgees notwithstanding their title by purchase was so far defective as to let in redemption, may readily be disposed of.

This was not a proceeding by Tod & Co. to obtain foreclosure. It was petitioner who sought the aid of the court, and this by an application which was, in effect, a bill to reclaim the securities absolutely and free from incumbrance. The Circuit Court treated the pleading as if framed in the alternative, and allowed redemption on conditions stated, the right thus accorded being necessarily declared to be extinguished if the conditions were not complied with as prescribed. And no error is assigned to the particular terms imposed.

Nor is there any tenable basis for the proposition that respondents' failure to sustain their purchase at the sale as a defence affected their rights as pledgees. Respondents stood on all their rights and were not put to an election. If the purchase was valid, the equity of redemption was wiped out. If invalid, the original lien remained. If superior, its superiority was not displaced by the claim of absolute title derived through the pledge as set forth in the pleadings.

Assuming that, as between the Union Loan & Trust Company and the syndicate, the company or its assignee had a lien on the securities in question, did the Circuit Court err in holding that the rights of respondents in respect thereof were paramount to those asserted by the intervening petitioner?

If not, then although the Circuit Court may have erred in holding that the sale of the securities did not absolutely cut off the claim of the company or its assignee, that would be an error of which petitioner could not, of course, complain.

Petitioner contends that his alleged lien or right was entitled to priority, because the securities "were wrongfully and fraudulently abstracted and diverted from said Trust Company in subsequent re-hypothecation with respondents;" and respondents did not hold them as received in good faith, in due course of business, for value and without notice, but acquired possession through transactions known to be

fictitious, usurious, *ultra vires*, fraudulent and void, and with notice.

The Circuit Court and the Circuit Court of Appeals agreed that respondents' right to the securities was superior to that asserted by petitioner, and we entirely concur in that conclusion.

So far from the securities being wrongfully abstracted from the Trust Company, we think that, whatever the agreement between the Trust Company and the syndicate, the Trust Company must be held to have parted with such of the securities as were ever in its custody, with full knowledge that they were to be hypothecated by Garretson; that indeed the evidence fairly shows that those which at any time came into the possession of the Trust Company were either deposited there by Garretson or by his order and direction, with the understanding on his part that he was authorized to withdraw them for the purpose of sale, pledge or otherwise, and that he always acted on that theory, with the consent and participation of Smith, as secretary and treasurer; and that in any view Smith's acts in the company's behalf must be held to have been performed with the actual or implied authority of the directors.

Smith, as secretary and treasurer, was the person who was actively engaged in the management of the affairs of the Union Loan & Trust Company; and held out to the public as having unlimited authority to manage its business and dispose of any of its securities. He endorsed in the company's name every note it put out, signed every letter that it wrote, and was, as respected the public, the Trust Company itself. Throughout all the transactions his conduct conceded that Garretson was the lawful holder of the stock and bonds tendered by him as collateral to the loans he negotiated. As such officer, he directly transmitted the securities of the Sioux City & Northern Railroad Company to New York, and likewise the $1,433,000 of Nebraska & Western bonds to Garretson at Omaha, to be delivered to the agent of Tod & Co., under the contract for the million dollar loan, and to be turned into court in carrying out the reorganization scheme

in accordance with which the Sioux City, O'Neill & Western bonds were to be issued.

It appears to us indisputable on the face of this record that Garretson was entrusted, according to the understanding of all parties, with the right to sell the Sioux City & Northern bonds; that the Union Loan & Trust Company received the proceeds of a million dollars of those bonds, thus ratifying the transaction; and that the proceeds of the balance were applied with Smith's knowledge, without objection on his part, or that of any other officer or director of the Trust Company, to taking up notes secured thereby, which had been given by Garretson to acquire the Nebraska & Western bonds, which he afterwards pledged to Tod & Co., and which were exchanged for the bonds of the Sioux City, O'Neill & Western Railroad in controversy.

None of the securities ever stood in the name of the Union Loan & Trust Company. And they were delivered in such form as to enable Garretson to hold himself out as the owner or lawful holder thereof, with full power of disposition.

The District Judge well said : " It is entirely clear that E. R. Smith, the secretary and treasurer of the company, dealt with these securities as though he had full authority from the company so to do, and he obeyed Garretson's instructions in regard to the same without demur; and it does not appear that the Trust Company, or any officer thereof, ever objected to such disposition of the securities; and, furthermore, so far as the evidence in this case discloses, the general management of the business of the Trust Company was entrusted to Smith, with very little, if any, supervision on the part of the directors or other officers of the corporation." 65 Fed. Rep. 564.

The truth of the matter seems to be, as the Circuit Court held, that, in order that the various properties represented by the stock and bonds should become valuable, it was necessary that the enterprises on which they were based should be carried through, and this required additional funds, to procure which the Trust Company consented to Garretson's negotiations with Tod & Co. and the Debenture Company, and the pledging of the securities.

The presumption on the facts is that the securities were delivered by the company to Garretson for use, and, if they had ever been pledged to the company, that the pledge was discharged by the voluntary parting with possession. There is nothing to show an intention to limit the use to a hypothecation in subordination to a prior pledge, let alone the question whether any such pledge existed, and the absence of evidence of any assertion thereof.

Certainly, under the circumstances, the company could not be allowed to set up its alleged title as against third parties taking in good faith and without notice. And the same principle is applicable to its assignee and to creditors seeking to enforce rights in his name. So far as this case is concerned there is nothing to the contrary in the statute of Iowa regulating assignments for the benefit of creditors as expounded by the Supreme Court of the State. Code Iowa, Tit. 14, c. 7; *Schaller* v. *Wright,* 70 Iowa, 667 ; *Mehlhop* v. *Ellsworth,* 95 Iowa, 657.

Section 2127 of the Code provides : " Any assignee, as aforesaid, shall have as full power and authority to dispose of all estate, real and personal, assigned, as the debtor had at the time of the assignment, and to sue for and recover, in the name of such assignee, everything belonging or appertaining to said estate, and, generally, do whatsoever the debtor might have done in the premises."

Conveyances by insolvent debtors in fraud of their creditors may be attacked by their statutory assignees, though equity would not aid the debtors themselves to recover the property, for the property transferred would, in the eye of the law, remain the debtors' and pass to the assignees, who would not be subject to the rule that those who commit iniquity have no standing in equity to reap the fruits thereof. But equities or rights belonging to particular creditors are not, by operation of law, transferred to such assignees.

The Trust Company did not own these securities, and did not transfer them in fraud of its creditors, prior to the assignment, so as to entitle the assignee to treat the transfers as void and the securities as belonging to the company.

And it must be remembered that this proceeding is an at-tempt on behalf of the holders of railroad syndicate paper, which constituted only a portion of the liabilities of the Trust Company, to establish equities in the securities on the ground that they were pledged to the company to secure it against liability on its indorsements of such paper, and that these equities, if any, must be worked out through the company.

The difficulty with the contention that the Trust Company was bound to hold the securities for the benefit of the holders of syndicate paper; that they were not duly parted with; and that Tod & Co. took with notice of the alleged interest of the Trust Company, and the equities of those holders, is that it does not appear that any of the syndicate paper was taken on the strength of these particular securities; or that Smith acted otherwise than with the knowledge and assent of the directors; or that Tod & Co. had notice of any claim of the Trust Company or its endorsees, or of any defect in Garretson's right to dispose of the securities.

The securities were railroad bonds, payable to bearer, and certificates of stock in the names of Garretson and his associates, with transfers endorsed by them in blank; and they were, in large part, sent to Tod & Co. by the Trust Company, at Garretson's request, with presumably full knowledge that they were to be used as collateral to loans he was procuring, without anything to indicate that the Trust Company had any interest in them, or any intimation of such interest. The securities did not stand in the name of the Trust Company, and Garretson did not, in any of his dealings with Tod & Co., assume to act for the company. The mere fact that he was one of its officers was not in itself sufficient to call for an inference that he was acting as such in these transactions, nor did he make his requests of Smith in that capacity, nor were they complied with by Smith as on that theory.

There was no actual notice, and as the visible state of things was consistent with Garretson's right to deal with the securities as he did, such notice cannot be presumed or implied. Nor do we regard the conduct of Tod & Co. as so negligent as to justify the application of the doctrine of constructive notice.

The circumstances relied on as imputing notice or requiring inquiry which would have resulted in notice are in our judgment inadequate to sustain that conclusion.

Thus it is said that because the Nebraska & Western bonds were overdue, and the mortgage in process of foreclosure, they were not negotiable and were taken subject to the alleged lien of the Trust Company. But they were assignable choses in action susceptible of being pledged, and were pledged to Tod & Co. until through the foreclosure and reorganization the new securities were substituted. As we have seen, the power of disposition had been lodged in Garretson by, or with the assent of, the Trust Company, and no secret equity could be set up by the latter.

So as to the fact that some of the shares of Sioux City & Northern stock delivered to Tod & Co. under the agreement of December 31, 1892, stood in the name of " A. S. Garretson, Trustee," the evidence disclosed that this stock belonged to Booge, one of the original members of the syndicate, and that he, having failed, had consented it should be put out of his name and held in trust, and that at this time there were no notes furnished by Booge to the syndicate outstanding. The Trust Company had no greater interest in this stock than in any other, and the word " trustee " was not intended to give and did not give notice of any rights claimed by the Trust Company.

Again elaborate argument is devoted to the point that Garretson was induced to assume the Nebraska & Western enterprise by false representations by the Manhattan Trust Company as to the condition of the Improvement Company; and that this led him to pledge the securities which he should have left with the Union Loan & Trust Company.

While we must not be understood as intimating in any degree that this charge of misrepresentation was made out, or, if it were, that Tod & Co. were cognizant thereof, it is enough that we are not satisfied that the transactions complained of involved notice of the claim of the Trust Company now set up.

But we do not feel called on to do more than allude to these

matters.  Tod & Co. held the securities under the $1,500,000 loan in trust for the purchasers of the notes thereunder issued, and neither the Debenture Company, through which the transaction was made, and which holds a few of the notes, nor any other of the beneficiaries, was before the court.  Nor was Garretson, nor any member of the syndicate, nor any holder of part of the million dollar loan, other than Tod & Co., a party to the record.

The Circuit Court correctly held that the prior transactions could not be overhauled under such circumstances; and applied the same principle to the last loan as well.

By the final decree petitioner was permitted to file a second amended petition, on which no issue could be, or was, joined, or additional testimony taken, and it was then set up, for the first time, that the loans were void because in contravention of the statutes of New York in relation to usury, and that petitioner was, therefore, entitled to reclaim the securities without compensation.  The prohibition against usury of the New York laws (N. Y. Rev. Stat. Banks Bros., 7th ed. p. 2253) could not be interposed by corporations as a. defence (Id. p. 2256; Laws, 1850, c. 172), nor could the endorsers of their paper plead the statute, *Union National Bank* v. *Wheeler*, 60 N. Y., 612; 96 U. S. 268; *Stewart* v. *Bramhall*, 74 N. Y. 85; *Junction Railroad* v. *Ashland Bank*, 12 Wall. 226; nor did it apply to demand loans of $5000 or upwards, secured by collateral.  Laws, 1882, c. 237, § 1; Laws, 1892, c. 689, § 56.

Apart from these considerations, the Circuit Court disposed of this contention on the ground that petitioner, in order to any relief in equity, would be compelled to pay the sums advanced and interest, but had not tendered or made any offer of payment.  This assumed that the point might have been passed on, if there had been such tender or offer, notwithstanding the Trust Company was not a party to the contract of loan, and neither the Bridge Company, nor Garretson, nor any member of the syndicate, nor the Debenture Company, nor any other loan holder, was a party to the record.  We think the court was right if the question was properly before it.  This was not a proceeding to enforce an alleged usurious agreement, but

it was petitioner who sought the affirmative aid of equity, which he could only obtain by doing equity. It is true that by a statute of New York (N. Y. Rev. Stat. 7th ed. 2255; Acts, 1837, c. 430, § 4), it is provided that whenever a borrower files a bill for relief in respect of violation of the usury law, he need not pay or offer to pay "any interest or principal on the sum or thing loaned;" but this act has been rigidly confined to the borrower himself (*Wheelock* v. *Lee*, 64 N. Y. 242; *Buckingham* v. *Corning*, 91 N. Y. 525; *Allerton* v. *Belden*, 49 N. Y. 373), and moreover, is not applicable to suits brought in courts not within the State of New York.

It is further urged that the transaction with the Bridge Company was *ultra vires*, and that, this being so, the securities should have been awarded petitioner free and clear from any condition whatsoever.

The Circuit Court held that the Bridge Company did exceed its powers, and that the matter must be treated as if that company had not been interposed as an actor in the transaction. Relief to the extent of redemption was on that account accorded, yet it was limited to that because there was nothing in the invalidity of the action of the Bridge Company which gave the Trust Company any greater right to the securities than it had before. The Bridge Company was not a party to the proceeding, and, indeed, if it had itself instituted suit for the cancellation of its notes, it could not have demanded possession of the securities. Clearly the Trust Company could not avail itself, in favor of its own alleged claim, of such an infirmity, if it existed, nor could the holders of the notes, which had passed into their hands as strangers, be deprived of the securities on the faith of which they had advanced their money; or have their rights adjudicated in their absence.

However, whatever the contention in the courts below may have been, the errors assigned here merely put forward the theory that the alleged usurious character of the contract by reason of the options granted and commissions paid, and its invalidity for lack of power in the Bridge Company, so took the transaction out of the ordinary course of business as to

charge Tod & Co. and the loan holders with bad faith and notice of the alleged claims of the Trust Company.

But we cannot perceive that the fact of usury between the parties to the contract, if usury there were, or action in excess of power, if that existed, either or both, can be laid hold of to justify the imputation of notice that Garretson was dealing with the securities in derogation of rights of the Trust Company. Doubtless there are cases where commercial paper or securities may be offered for negotiation under circumstances so out of the usual course of business as to throw such grave suspicion on the source of title that lack of inquiry, assuming that it would disclose defects, might amount to culpable negligence. But that doctrine has no application here.

Respondents had possession of all the Sioux City, O'Neill & Western bonds, and 7200 shares of Sioux City & Northern stock, in pledge to secure payment of $1,000,000 of Garretson's notes payable on demand, which amount had been borrowed for the purposes of, and was used in acquiring the Sioux City, O'Neill & Western Railroad for, the syndicate.

The syndicate was engaged in constructing a bridge across the Missouri River to connect the railroad in Nebraska with that in Iowa. The stock of the Bridge Company was all owned by the syndicate, and had been pledged with the bonds of the Sioux City, O'Neill & Western Railway.

Garretson applied for a new loan of $1,500,000, with which to take up the million dollar loan and get additional funds for the construction of the bridge.

As the railroads whose bonds and stock constituted the security were new and the securities were then without market value, the negotiation of the loan was made more attractive to the Debenture Company by the allowance of the commission and certain options. And since there seems to have been a question as to whether the agreements might not be obnoxious to the New York usury statutes and as notes of a corporation were supposed to be more readily salable than those of an individual, it was thought best to make the loan directly to one of the corporations owned by Garretson and his associates. The original suggestion was that the loan

should be made to the Sioux City, O'Neill & Western Railway Company, but objections being raised to this in view of certain provisions of the statutes of Nebraska, it was arranged between Tod & Co. and Garretson and his associates that the Bridge Company, which was equally owned by the syndicate, and to the purposes of which $500,000 of the loan were ostensibly to be devoted, should become the borrower. The sale of the securities, the issue of the notes secured thereby, and the making of the loan followed.

Garretson executed the indenture of trust to Tod & Co., the Debenture Company paid over $1,500,000 and interest to them, and they took up the million dollar loan, thereby releasing the Sioux City, O'Neill & Western bonds and 7200 shares of Sioux City & Northern stock; the balance of the latter stock was sent to Tod & Co. by the Trust Company; Tod & Co., as trustees, certified on the notes that the collateral had been deposited with them, and the notes were sold to various purchasers, who apparently advanced their money in good faith.

If the transactions, thus briefly stated, were unaffected by notice of any want of authority in Garretson in respect of the Trust Company as now alleged, it is not for that company to say that Tod & Co., or the holders of the loan, should be held chargeable with notice simply because the commissions and options might have constituted usury as between the parties to the loan, or the Bridge Company, its stockholders, or judgment creditors might have had cause of complaint of defect of power.

In letting petitioner in to redeem the Circuit Court went at least as far as the record would permit. Whether or not there was error in the decree of which respondents might have complained, we do not feel at liberty to decide.

*Decree affirmed.*