MCI TELECOMMUNICATIONS
CORPORATION, et al.,
Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Pacific Bell, et al., Intervenors.

Nos. 93–1166, 93–1191, 93–1223, 93–1224, 93–1234, 93–1235, 93–1236, 93–1237, 93–1238, 93–1239, 93–1280, 93–1281, 93–1282, 93–1287, 93–1288, 93–1353, 93–1418, 93–1427, 93–1446, 93–1462, 93–1527, 93–1528, 93–1529, 93–1530, 93–1531, 93–1532, 93–1535, 93–1536, 93–1537, 93–1538, 93–1539, 93–1540, 93–1541, 93–1542, 93–1543, 93–1544, 93–1545, 93–1546, 93–1559, 93–1598, 93–1606, 93–1607, 93–1608, 93–1609, 93–1613, 93–1644, 93–1677, 93–1685, 93–1825, 94–1123, 94–1124 and 94–1332.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 11, 1995.

Decided August 1, 1995.

Robert J. Aamoth, Washington, DC, argued the cause for MCI Telecommunications Corp. and the other Interexchange Carrier Petitioners. With him on the briefs were Frank W. Krogh, Donald J. Elardo, Roy L. Morris, Michael B. Fingerhut, and Genevieve Morelli, Washington, DC. Leon M. Kestenbaum, Washington, DC, entered an appearance.

Mark L. Evans, Washington, DC, argued the cause for the Local Exchange Carrier Petitioners and Intervenors. With him on the briefs were Alan I. Horowitz, M. Robert Sutherland, Joseph Di Bella, James P. Tuthill, John W. Bogy, James L. Wurtz, Durward D. Dupre, Paul Walters, Robert B. McKenna, Alan Y. Naftalin, Charles R. Naftalin, Gerard J. Duffy, and Francis E. Fletcher, Jr. Richard C. Hartgrove, Robert S. Lynch, William B. Barfield, Benjamin H. Dickens, Jr., Alfred W. Whittaker, Floyd S. Keene, Curtis A. Bradley, Jr., E. Edward Bruce, Eugene D. Gulland and Margaret D. Brown, Washington, DC, entered appearances.

Douglas E. Hart, Cincinnati, OH, argued the cause for Cincinnati Bell Telephone Co. With him on the briefs was Thomas E. Taylor. Lisa A. Thornton, Cincinnati, OH, entered an appearance.

Laurel R. Bergold, Counsel, F.C.C., argued the cause, Washington, DC, for respondents. With her on the briefs were Anne K. Bingaman, Asst. Atty. Gen., Catherine G. O'Sullivan and Robert J. Wiggers, Attys., U.S. Dept. of Justice, William E. Kennard, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and John E. Ingle, Deputy Associate Gen. Counsel, F.C.C., Washington, DC.

Peter D. Keisler, Washington, DC, argued the cause for Interexchange Carrier Intervenors. With him on the briefs were Andrew D. Lipman, Ky E.B. Kirby, Mark C. Rosenblum and Robert J. McKee. Marc E. Manly, John R. Ferguson, John Thorne, Lawrence W. Katz and Michael D. Lowe, Washington, DC, entered appearances.

Before: EDWARDS, Chief Judge; WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

In these consolidated cases, we review 21 orders of the Federal Communications Commission adjudicating damage actions filed by several interexchange carriers (IXCs) alleging that various local exchange carriers (LECs) overcharged them for interstate access services. The LECs ask us to set aside the 21 orders on the ground that the Commission's approach to awarding damages is unlawful and most of the IXCs' damages claims are barred by the statute of limitations. The IXCs want us to modify the Commission's orders only insofar as they allow the LECs to take "limited offsets" against the damage awards to the IXCs. One IXC (Allnet Communication Services, Inc.) argues in the alternative that if limited offsets are to be allowed, then the Commission should increase the interest rate payable on its award of damages. Because we conclude that the Commission's general approach to damages is not unlawful and that

the IXCs' claims are not barred by the applicable statute of limitations, we deny the petitions of the LECs in their entirety. Because we agree with the IXCs that the Commission's limited offset policy is unlawful, we grant the IXCs' petitions with regard to that issue, vacate the Commission orders in part, and remand these matters to the Commission to recalculate the IXCs' damages. Allnet's petition is dismissed as moot in view of our decision invalidating limited offsets.

## I. BACKGROUND

Interexchange carriers such as petitioner MCI pay LECs for access to local telephone users. From the mid–1970's until the early 1990's the Commission's primary method for regulating the price of interstate access was to prescribe a maximum rate of return on equity that a LEC could earn from the sale of interstate access over a given period of time. *See National Rural Telecom Ass'n v. F.C.C.,* 988 F.2d 174 (D.C.Cir.1993) (reviewing the Commission's later switch from rate-of-return to price-cap regulation). The claims at issue here are based upon certain LECs' having earned rates of return above the maxima prescribed by the Commission. In order properly to understand those claims, however, the reader may find an abbreviated regulatory history helpful.

### A. Regulatory History

In 1972 the Commission decided that rather than prescribe the rates that AT & T could charge it would prescribe the maximum rate of return that AT & T could earn (8.5%) and leave it to the carrier to set its rates at a level designed to yield up to the prescribed rate of return. *See American Tel. & Tel. Co. and the Assoc. Bell System Companies, Charges for Interstate Telephone Service, Decision and Order,* Docket No. 19129, 38 F.C.C.2d 213 (1972). Upon review, we upheld this rate-of-return approach as an appropriate exercise of the Commission's general regulatory powers under § 4(i) of the Communications Act, 47 U.S.C. § 154(i). *See Nader v. F.C.C.,* 520 F.2d 182, 203–04 (1975).

In 1976 the Commission raised AT & T's allowable rate of return to 9.5%, *American*

*Tel. & Tel. Co., Charges for Interstate Telephone Service, Decision,* Docket No. 20376, 57 F.C.C.2d 960, 972–73 (1976), plus a buffer of .5% inasmuch as it announced that it would not take enforcement action unless the Company's return actually exceeded 10%. *Id.* at 973. AT & T thereupon filed a tariff structure that produced a return below 10% for 1976 and 1977, but in 1978 the same rates produced a return above the 10% ceiling. The Commission responded by requiring AT & T (and the post-divestiture Bell Operating Companies) to return their excess earnings to customers by reducing future rates. *AT & T Earnings of Interstate and Foreign Services During 1978, Decision,* CC Docket No. 79–187, 102 F.C.C.2d 52, 62–63 (1984). AT & T challenged the Commission's statutory authority to require such a refund, but the court upheld the FCC's authority to impose that remedy, again pursuant to § 4(i). *New England Tel. & Tel. Co. v. F.C.C.,* 826 F.2d 1101, 1106–09 (D.C.Cir.1987) (*NETCO*).

By the time the court published its decision in *NETCO,* however, the Commission had already changed course, establishing a more comprehensive approach to regulating the LECs' rate of return. *See Authorized Rates of Return for the Interstate Services of AT & T Communications and Exchange Telephone Carriers, Phase I, Report & Order,* CC Docket No. 84–800, 58 Rad.Reg.2d 1647 (P & F) (1985) (*Prescription Order*), *recon., Memorandum Opinion & Order,* 59 Rad.Reg.2d 1592 (P & F) (1986) (*Prescription Reconsideration*). The Commission still prescribed a maximum rate of return that a LEC could earn from the sale of interstate access overall, but now it also set a maximum rate of return for each of three specific types of interstate access service (*viz.,* "special," "common line," and "switched traffic sensitive") and established a refund mechanism whereby a LEC would automatically be required at the end of a monitoring period to refund all revenues that it had collected above the amount corresponding to its allowed rate of return for each category. *Prescription Reconsideration,* 59 Rad.Reg.2d at 1604. Thus, a LEC could be required automatically to refund its excess earnings for one type of access service even if its earnings from the provision of access ser-

vices overall were below the maximum rate of return allowed. The Commission recognized this possibility, but explained that categorical (*i.e.,* type-specific) rate-of-return prescriptions were necessary in order to prevent rate discrimination: without them, the LECs could charge an excessive rate to purchasers of one type of access in order to subsidize the rate charged to purchasers of another type. *Id.* at 1603. Upon review this court held, following *NETCO,* that the Commission has the statutory authority both to prescribe a rate of return and to order a refund when that prescription is violated; at the same time we held that the Commission's decision to require automatic refunds for each category in which a LEC overearned was arbitrary and capricious and therefore unlawful because that mechanism was inconsistent with what the court perceived to be the Commission's general approach to rate-of-return regulation. *American Tel. & Tel. Co. v. FCC,* 836 F.2d 1386, 1390–92 (1988) (*AT & T*).

B. *The Present Proceedings*

Although the court overturned the automatic refund rule, it did not strike down the rates of return that the Commission had authorized, either for access service in general or for any specific type of access. The Commission therefore continued to set general and categorical rates of return that limited the amount that a LEC could earn over any given two-year monitoring period. For example, for the 1987–88 and 1989–90 monitoring periods, the Commission prescribed a maximum rate of return of 12% both for overall earnings and for each type of service, and added enforcement buffers of .25% for overall earnings and .4% for each category. *See Authorized Rates of Return for the Interstate Services of AT & T Communications and Exchange Telephone Carriers, Phase III, Memorandum Opinion & Order,* CC Docket No. 84–800, 60 Rad.Reg.2d 1589, 1607 (P & F) (1986) (setting percentage rates of return for 1987–88); *American Tel. & Tel. Co. v. Central Tel. Co., et al., Memorandum Opinion & Order,* 8 F.C.C.R. 3546, 3547 (1993) (observing that rates of return for 1987–88 period were extended through 1989–90 period).

Shortly after the court's decision in *AT & T*, the IXCs began to file complaints with the Commission, pursuant to §§ 206–09 of the Communications Act, 47 U.S.C. §§ 206–09, seeking damages from each LEC that had allegedly overcharged the IXCs for access service because it had earned (either for a category of service or overall) more than the maximum allowable rate of return for the monitoring period. The IXCs based their allegations upon the reports that the LECs are required to file with the Commission after the end of each monitoring period; the IXCs alleged (and most LECs conceded) that they reported earnings in excess of the maximum prescribed levels. The complaints at issue here relate to the monitoring periods 1985–86, 1987–88, and 1989–90.

Although the Commission adjudicated the complaints separately and the details of each differ somewhat, the agency set forth the general principles under review here in two orders, both of which pertain to the claims made by MCI. *See MCI Telecommunications Corp. v. Pacific Northwest Bell Tel. Co., et al., Memorandum Opinion & Order,* 5 F.C.C.R. 216 (1990) (*MCI Liability Order*); *MCI Telecommunications Corp. v. Pacific Bell Tel. Co., et al., Memorandum Opinion & Order,* 8 F.C.C.R. 1517 (1993) (*MCI Damages Order*). In those orders (as in the others under review) the Commission held that a LEC that earns in excess of the prescribed rate of return (either for a category or overall) for a monitoring period violates the Communications Act. *MCI Liability Order,* 5 F.C.C.R. at 223. The Commission further held that "the proper starting point for assessing damages based on violations of a rate of return prescription is to look at the difference between the amount [the IXC complainant] paid for [the defendant LEC's] interstate access services and the amount it would have paid if [the LEC] had charged rates that produced returns within the Commission's prescribed levels." *MCI Damages Order,* 8 F.C.C.R. at 1525. The Commission then allowed each defendant LEC to take "limited offsets," meaning that the defendant LEC could subtract from the amount that the IXC overpaid, as derived above, any amount that the same IXC customer had "underpaid" the LEC (*i.e.,* insofar as it had

paid a rate that yielded a return below the prescribed maximum) for any category of service during the same monitoring period. *Id.* at 1528.

## II. ANALYSIS

The LECs and the IXCs both attack the Commission's rules, albeit from opposite directions. The LECs seek vacatur of some if not all of the damage decisions, while the IXCs ask us effectively to increase the amount of damages awarded in most of the cases.

### A. *The LECs' Claims*

The LECs contend that: (1) the Commission's approach to damages is precluded by our decision in *AT & T;* (2) the Commission improperly concluded that LEC earnings in excess of the allowed rates of return are *per se* unlawful; (3) the Commission improperly allowed the IXCs to recover damages without requiring them each to show what would have been the just and reasonable rate and by exactly how much it overpaid; and (4) most of the damage claims are barred by the two-year statute of limitations in the Communications Act. None of these assertions has merit.

### 1. *The teaching of* AT & T

The LECs argue that all of the damage awards should be reversed because they are functionally equivalent to the automatic refund remedy that we disapproved in *AT & T.* The LECs' argument fails because, the question of functional equivalence quite apart, it proceeds from a misunderstanding of our *AT & T* decision.

In *AT & T* we took issue with the automatic refund rule because it required a LEC to refund earnings to the extent that it earned more than the allowable rate of return for a particular type of service without any offset for any types of service in which the LEC had earned less than the allowable rate of return. That approach "virtually guaranteed" that the LECs would earn an aggregate rate of return below that which the Commission had prescribed. *AT & T,* 836 F.2d at 1390–91. The LECs suggest that we

thereby fashioned a broad rule prohibiting the Commission from awarding damages for overearnings in one category of service without allowing a LEC to offset all underearnings that it had for other categories. On the contrary, our holding was much more narrow: The Commission's approach was unlawful because it was inconsistent with what we were told was the Commission's own understanding of its of rate-of-return regulation. *Id.* at 1390–91. We believed—based upon certain FCC ratemaking orders and upon representations by the Commission's counsel at oral argument—that the Commission viewed its rate-of-return prescriptions as stating not only the maximum that a LEC could reasonably charge its customers but also the minimum that the LEC could charge and still attract investment capital. *Id.* at 1390. We therefore held that a refund rule that would inevitably cause the LEC to earn an overall rate of return below the prescribed level was unreasonable because it amounted to a "self-contradiction" and "would operate over the long run to put [the LECs] out of business." *Id.* at 1390–91.

The Commission responded to our decision by "clarify[ing]" its view of rate-of-return regulation, as follows:

> [W]e do not view [the rate-of-return] prescription as "both a maximum and a minimum." That is, it does not represent a unique balance point such that "if the rate were higher, the balance would tip in favor of the investor; if lower, it would tip in favor of the consumer." Our accumulated experience with rate of return prescriptions, and our review of the cost of capital evidence in this proceeding, convince us that there is no such point. Indeed, even the lower boundary of our range of cost of capital estimates does not represent a bright line such that a company earning just below that level would be forced out of business. We believe there is a substantial gap between an earnings level that is fully adequate to assure attraction of capital on favorable terms, and an earnings level which, if sustained over time, would be confiscatory.

*Represcribing the Authorized Rate of Return for Interstate Services of Local Exchange Carriers, Order,* CC Docket No. 89–624, 5 F.C.C.R. 7507, 7532 (1990); *accord Amendment of Parts 65 and 69 of the Commission's Rules to Reform the Interstate Rate of Return Represcription and Enforcement Processes, Notice of Proposed Rulemaking and Order,* CC Docket No. 92–133, 7 F.C.C.R. 4688, 4701 (1992).

██ This clarification is critical for two reasons. First, it allays any concern with "self-contradiction": Even if the Commission's new approach has the same effect as did the automatic refund rule in *AT & T,* that outcome no longer appears to be inconsistent with the Commission's view of how rate-of-return regulation should work. Second, it removes the premise from which the *AT & T* court reasoned that the refund rule would operate over the long run to put LECs out of business. It is, of course, still true that by awarding damages on a category-by-category basis while allowing only limited offsets—*viz.,* offsets for "underpayments" made by the same customer for other access services during the same monitoring period—the Commission's approach to damages has caused many LECs to earn, in the aggregate, less than the maximum rate of return allowed for the monitoring period(s) at issue. As the Commission's approach has been clarified, however, that does not necessarily mean that any LEC earned less than the minimum amount necessary to attract capital and, in fact, no LEC has demonstrated that its rate of return (*i.e.* net of damage awards) was unreasonably low. Indeed, the LECs make no factual showing at all with respect to that issue. Hence, even assuming *arguendo* that the Commission's approach to awarding damages is functionally equivalent to the automatic refund remedy held unlawful in *AT & T,* that is no warrant for striking down the Commission's damage awards here. As we explained in *NETCO,* the LECs "have no statutory entitlement to a perfectly balanced regulatory regime; rather they are entitled only to earn an overall reasonable return." 826 F.2d at 1108–09.

The LECs offer up the Sixth Circuit's decision in *Ohio Bell Tel. Co. v. F.C.C.,* 949 F.2d 864 (1991), and our decision in *Virgin Islands Tel. Corp. v. F.C.C.,* 989 F.2d 1231

(1993), as further support for their claim that the Commission must allow a LEC to offset against an award of damages for overearnings on one type of service any underearnings that it had for other types. Although *Ohio Bell* involved an individual refund rather than the general, automatic refund provision, the Sixth Circuit expressly followed our decision in *AT & T*; it held that it is inconsistent with the Commission's own rate-of-return regulatory policy for the Commission to require that a LEC refund overearnings on a category-by-category basis without allowing it to offset underearnings in other categories of interstate access service. *Id.* at 872–74. So far as the opinion reveals, however, the Sixth Circuit was not aware of the Commission's clarifying statement; that court appears to have believed, as had we in *AT & T*, that the Commission regarded the target rate of return as both a maximum and a minimum. That premise having since been removed, *Ohio Bell* does not advance the LECs' argument any further than does *AT & T*.

We are quite frankly mystified by the LECs' attempt to draw support from our *Virgin Islands* decision. In that case we reversed a Commission order that required a LEC to refund interstate access earnings that were running above the prescribed rate of return as of the middle of an on-going monitoring period—a factual situation not present in any of the cases before us now. Indeed, in reversing the Commission we explained that its decision to require a refund in the middle of the monitoring period was "analogous to that of a parent who admonishes his child not to eat more than one candy bar per day, and then concludes that the prescription has been violated when he observes the child eat the first half of a candy bar in one minute." 989 F.2d at 1238. Moreover, we explained that "*AT & T* ... emphasized that the Commission's authority to order refunds where a carrier has violated an outstanding rate-of-return prescription 'must ... be exercised in a way that does not contradict the Commission's own theory of rate of return regulation.'" *Id.* at 1234 (quoting *AT & T*, 836 F.2d at 1392). The *Virgin Islands* opinion, therefore, only strengthens our view that *AT & T* was based

narrowly upon the apparent conflict between the Commission's automatic refund and its own rate-of-return philosophy, as we then understood it, and not upon the LECs' broader reading of that case.

Petitioner Cincinnati Bell Telephone Company makes a separate argument that differs from that of the other LECs only in emphasis. Because Cincinnati Bell had overearnings for all three types of access service during the 1987–88 monitoring period, it focuses not upon offsets among types of services but upon the Commission's refusal to allow it to offset earnings below the prescribed rate of return for prior and subsequent monitoring periods. Its argument that such offsets are required under *AT & T*, however, relies upon the very interpretation of that case that we rejected above; we therefore find Cincinnati Bell's separate argument unconvincing.

### 2. *The Commission's approach to establishing a violation of the act*

■ The IXCs base their damage claims upon § 206 of the Communications Act, which provides:

> In case any common carrier shall do ... any act, matter, or thing in this [Act] prohibited or declared to be unlawful ... such common carrier shall be liable to the person ... injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this [Act]. . . .

47 U.S.C. § 206. Although the LECs' earnings exceeded the maximum rates of return prescribed by the Commission, they contend that such overearning does not by itself constitute a violation of the Communications Act and therefore cannot serve as the sole basis for their damage liability pursuant to § 206. We disagree.

As discussed above, in *NETCO*, 826 F.2d at 1106–07, we held that the Commission has the statutory authority to prescribe a carrier's maximum rate of return and to require a LEC that fails to comply to refund earnings in excess thereof. More important, we held that:

The Commission's chief concern in issuing [rate-of-return] prescriptions is protecting just and reasonable rates.... The idea of a prescription ... is that the agency has proclaimed that a certain situation—here a return in excess of 10%—is unlawful and *shall not occur.*

*Id.* at 1106 (emphasis in original). Relying upon our earlier decision in *Nader* we further explained that a rate-of-return prescription has "the force of a statute" and is "no less binding" than an order establishing the maximum rate that a carrier may lawfully charge. *Id.* at 1107. In *AT & T* we reconfirmed all this, explaining that in *Nader* we had held "that the Commission has power under [the Communications Act] to prescribe rates of return as well as rates," and that in *NETCO* we had held that the "prescription of a rate of return ... represent[s] a proclamation by the Commission that earnings in excess of the prescribed rate are unlawful...." 836 F.2d at 1392. Hence, all these cases—*Nader, NETCO,* and *AT & T*—stand squarely in opposition to the LECs' position: We have repeatedly held that a rate-of-return prescription has the force of law and that the Commission may therefore treat a violation of the prescription as a *per se* violation of the requirement of the Communications Act that a common carrier maintain "just and reasonable" rates, *see* 47 U.S.C. § 201(b).

The LECs attempt to avoid this seemingly inevitable conclusion by relying once again upon our *Virgin Islands* decision. There, after holding the Commission's refund order invalid because it was imposed as of the middle of a monitoring period, we went on to note that:

the prescribed rate of return is but "one component" of a carrier's tariff schedules. Projected operating expenses, market forecasts and competitive conditions must also be considered by carriers when they settle on a final access rate. Given this multitude of inputs, the prospective selection of a tariff that will generate the prescribed rate of return is necessarily an imprecise endeavor. Thus, once the Commission finds that a carrier has exceeded (as a pure mathematical matter) its prescribed rate of return, it should then consider oth-

er relevant factors in determining whether a rate is unreasonable and a refund warranted.

989 F.2d at 1239. We also went on to list the sort of factors that the Commission should consider in deciding whether to order a refund, including: (1) whether the LEC's projections were reasonable when made; (2) the actual harm suffered by the ratepayer; and (3) any "overriding equitable considerations." *Id.* at 1240.

Seen in context, however, we do not think that our *Virgin Islands* decision is a bar to the Commission's decision to treat earning more than the prescribed rate of return as a *per se* violation of the Act for the purpose of adjudicating a damage claim. *Virgin Islands* arose under § 204 of the Communications Act, which provides that, under certain circumstances, the Commission itself "may ... require [a carrier that has collected an excessive amount] to refund, with interest, ... such portion of such charge ... as by its decision shall be found not justified." 47 U.S.C. § 204. Because the § 204 refund remedy is couched in permissive terms, the court was in effect advising the Commission of the issues it must consider in exercising its discretion whether to require a refund. In the present cases, by contrast, the Commission is responding to complaints brought by customers of the LECs under § 206 of the Act, which is phrased in mandatory terms: A carrier that has violated the Act "shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation...." 47 U.S.C. § 206. Therefore, the factors that we set out in the *Virgin Islands* case do not apply where, as here, the Commission is adjudicating a damage claim made by a customer pursuant to § 206.

### 3. *Equating damages (before limited offsets) with earnings in excess of prescribed rates of return*

■ Closely related to the LECs' argument against liability for overearning is their claim that, in order to calculate its damages, an IXC must identify the specific rate that the LEC could reasonably have charged it. They contend that this is required by both

Supreme Court and circuit precedent, which teaches that a customer's damage is the "difference between the charges paid and the just and reasonable rate[ ]." *United States v. Associated Transport, Inc.*, 505 F.2d 366, 369 (D.C.Cir.1974); *see also Reiter v. Cooper*, —— U.S. ——, ——, 113 S.Ct. 1213, 1217, 122 L.Ed.2d 604 (1993); *Meeker v. Lehigh Valley R.R. Co.*, 236 U.S. 412, 428, 35 S.Ct. 328, 334, 59 L.Ed. 644 (1915); *Oneida Motor Freight, Inc. v. I.C.C.*, 45 F.3d 503, 507 (D.C.Cir.1995).

What the Commission actually did was something rather different. In order to arrive at an initial (*i.e.*, pre-offset) figure the Commission assumed that an IXC's damages are equal to (1) the aggregate amount that the IXC paid the LEC for a specific category of access service, (2) less the aggregate amount that the IXC would have paid for that service had the LEC charged the IXC a rate that would have produced earnings at the maximum allowed rate of return. *MCI Damages Order*, 8 F.C.C.R. at 1525. That would be a way of calculating the difference between the charges paid and the just and reasonable rate, but the Commission did not require the IXCs actually to make this precise calculation. Rather, for simplicity, the Commission allowed each IXC to approximate that calculation by multiplying the percentage amount by which the LEC overearned—the difference between the LEC's actual and prescribed rates of return—times the total dollar amount that the IXC paid for that type of access. *See, e.g., MCI Damages Order*, 8 F.C.C.R. at 1521–22, 1525.

The cases cited by the LECs do state that the ratemaking agency must establish the just and reasonable rate in order to calculate damages, but that is all that they say. They do not discuss this requirement in any detail, and none of them involves a situation in which the regulatory agency had prescribed a binding rate of return rather than an actual rate. Therefore they do not address, let alone answer, the fundamental question at issue here—whether an agency that regulates by prescribing a rate of return may allow a customer that was overcharged because the carrier earned more than its allowed rate of return, rather than deriving an actual rate, to make a simplifying assumption about what the reasonable rate would have been.

In support of its simplified approach, the Commission notes that to require the complaining IXC to establish the rate that would have produced only a reasonable rate of return for the LEC would be to ask of it the very thing that the LEC was itself unable to do. *MCI Damages Order*, 8 F.C.C.R. at 1525. The Commission rejected that idea because, as it said with admirable restraint:

> [I]t would be inequitable to permit defendants [the LECs], who were in the best position to set their rates at lawful levels in the first place, and who later had opportunities to correct those rates, to avoid responsibility for those unlawful rates, at the expense of their customers.

*Id.* The Commission's point is as well-taken as the LECs' is absurd. During any monitoring period in which its rates appeared destined to yield earnings above (or for that matter below) its authorized rate of return the LEC could have revised its tariffs to avoid that result. *See Prescription Order*, 58 Rad.Reg.2d at 1653–54 (P & F). Moreover, by incorporating a buffer into its rate-of-return prescriptions the Commission had allowed each LEC some margin for error. These provisions afforded each LEC considerable flexibility to use the market information available to it—the LEC presumably knew at least approximately what its revenues and costs were—to fashion a rate that was "reasonable," *i.e.*, would not result in a return above the maximum allowed. If the LEC, with its superior information, could not (or did not) accurately establish such a rate, then it seems obvious that the IXC could not (or should not be expected to) establish such a rate from the outside looking in.

Admittedly, any calculation of the rate that will produce a targeted rate of return, whether it is done by the Commission, an IXC, or for that matter a LEC, is necessarily but an estimate. It is not possible to know precisely the effect that any given rate, or change from a prevailing rate, will have upon revenues (and therefore upon the LEC's rate of return); that depends upon the elasticity of the demand for the service, which cannot be known for certain, 1 ALFRED E. KAHN, THE

ECONOMICS OF REGULATION: PRINCIPLES AND INSTITUTIONS 185–88 (1970); *see also* Douglas H. Ginsburg, *The Goals of Antitrust Revisited*, 147 J. INST'L & THEORETICAL ECON. 24, 25 (1991). If demand is at all price-elastic, however, then it is axiomatic that a reduction in the price charged will result in an increase in the quantity sold and that any reduction in revenues associated with the reduction in price will be less than proportionate. *See* WILLIAM J. BAUMOL & ALAN S. BLINDER, ECO-NOMICS: PRINCIPLES AND POLICY 468–72 (5th ed. 1991). Nonetheless, the approach that the IXCs have taken to calculating damages is premised upon a model in which it is assumed that demand is completely inelastic over the relevant range (and that short-run marginal cost is zero), so that a one percent reduction in rates would have produced a full one percent reduction in revenues. In other words, it establishes as "reasonable" the rate that would have produced earnings within the prescribed level, holding cost and demand constant. This approach yields a conservative estimate because it implicitly assumes that the quantity demanded would not increase if the price were lowered. The actual reasonable rate would, if anything, therefore be lower than the rate derived by the IXCs.

Because any determination of the reasonable rate will necessarily be an estimate under the rate-of-return regime, and because the estimate relied upon by the IXCs is a conservative one, we reject the LECs' contention that the Commission failed to require the IXCs adequately to prove their damages.

### 4. *The statute of limitations*

■ The Communications Act provides that "[a]ll complaints against carriers for the recovery of damages not based on [charges in excess of those made applicable in a tariff] shall be filed with the Commission within two years from the time the cause of action accrues, and not after." 47 U.S.C. § 415(b). The question here is at what point an IXC's cause of action accrues. The LECs argue for what amounts to a "time-of-injury" rule; they contend that a cause of action accrues on the last day of the monitoring period to which it relates—which would mean that

nearly all of the claims at issue here are time-barred. The Commission, on the other hand, argues for what is generally called a "discovery-of-injury" rule; it contends that a cause of action accrues only when the IXC discovers (or with due diligence should discover) that it has been overcharged. According to the Commission, moreover, that does not occur until after the LEC files its final earnings report for the two-year monitoring period at issue. We agree with the Commission that the discovery-of-injury rule applies to these causes of action.

In *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 342 (D.C.Cir.1991), the court (per then-Judge Ruth Bader Ginsburg) aligned the law of this circuit with that of the eight other circuits to have considered the matter and held that "the discovery[-of-injury] rule is the general accrual rule in federal courts," applicable in federal question cases "in the absence of a contrary directive from Congress." We also explained that the time-of-injury rule is not inconsistent with, and indeed should be considered a part of, the broader discovery-of-injury rule:

> [I]f the injury is such that it should reasonably be discovered at the time it occurs, then the plaintiff should be charged with discovery of the injury, and the limitations period should commence, at that time. But if, on the other hand, the injury is not of the sort that can readily be discovered when it occurs, then the action will accrue, and the limitations period commence, only when the plaintiff has discovered, or with due diligence should have discovered, the injury.

The LECs point to no directive from Congress suggesting that the general discovery-of-injury rule does not apply to a damage claim asserted under § 206 of the Communications Act. Instead, they rely only upon our recent decision in *3M Co. v. Browner*, 17 F.3d 1453 (1994), which involved a civil enforcement proceeding brought for violations of the Toxic Substances Control Act that were alleged to have occurred more than five years earlier. We held that the EPA's cause of action accrued, and thus the five-year statute of limitations began to run, when the violation occurred rather than when the EPA

actually discovered or with due diligence should have discovered the violation. *Id.* at 1460–63. In so doing, we specifically took note of the general discovery-of-injury rule that we had recently adopted in *Connors*, but explained that it "applied only to remedial, civil claims." *Id.* at 1460. Because the case against 3M was penal in nature—the statute imposed a five-year limitations period for any "fine, penalty, or forfeiture"—we held that the generally applicable discovery-of-injury rule adopted in *Connors* did not apply in that case. If the discovery-of-injury rule were applicable to an agency-initiated civil penalty case, then the court would have to determine whether the agency, with the exercise of due diligence should have detected the violations earlier than it had—an oversight activity that (at least absent a statutory directive to the contrary) is better suited to the legislature than to the court. *Id.* at 1461.

As the foregoing suggests, *3M* is of no help to the LECs' cause because it deals only with the special circumstance, not present here, of an agency-initiated civil penalty case; *3M* leaves the discovery rule of *Connors* intact for remedial civil actions such as the IXCs brought against the LECs. Therefore we follow the discovery-of-injury rule adopted in *Connors* to determine when the claims of the IXCs accrued.

■ The LECs contend that even if the discovery-of-injury rule applies, most of the IXCs' claims are time-barred: The Commission allowed them to go forward, according to the LECs, only because it erroneously held that an IXC's claim does not accrue until the LEC from which the IXC seeks damages files its final earnings report for the monitoring period at issue, *i.e.*, nine months after the close of that period. The LECs argue that such a claim accrues three months after the close of the monitoring period, the time by which the Commission requires the LEC to file a preliminary earnings report.

The LECs' position would be tenable if, after reviewing the relevant preliminary reports, an IXC exercising due diligence should have discovered that it had been overcharged. *Connors*, 935 F.2d at 342. But that is not the case. The *raison d'etre* for the final report is to afford the LEC time to adjust the data submitted in its preliminary report, *see Amendment of Part 65, Interstate Rate of Return Prescription: Procedures and Methodologies to Establish Reporting Requirements, Report and Order*, CC Docket No. 86–127, 1 F.C.C.R. 952, 954 (1986); it therefore would be passing strange to require an IXC to assume that the preliminary report is a reliable indicator of whether the LEC has earned more than allowed. Indeed, the Commission points out that in five of the claims before us the preliminary report did not accurately reveal whether the LEC had exceeded its allowable rate of return. This, we think, is convincing evidence that even a diligent IXC could not reliably ascertain whether it had been injured solely upon the basis of the preliminary report. Therefore we agree with the Commission that a cause of action for damages pursuant to § 206 does not accrue until after the LEC files its final report.

### B. *The IXCs' Claims*

■ Recall that the IXCs ask us to vacate only the Commission's "limited offset" rule, that is, its policy of allowing a LEC to offset against any overcharge that an IXC paid for one type of access the amount that the same IXC "underpaid" the LEC (*i.e.*, insofar as it paid a rate that yielded a return less than the prescribed maximum) for any other type of access during the same monitoring period. The IXCs advance three primary contentions: They claim that allowing "limited offsets" (1) violates both FCC and related ICC precedent, and (2) the "filed rate doctrine"; and (3) was inadequately explained (and thus arbitrary and capricious) under the standards of the Administrative Procedure Act. Because we agree with the IXCs' first contention and upon that basis vacate the limited offsets, we do not reach the latter two claims. (Nor do we consider Allnet's alternative claim that the Commission improperly set the interest rate it is due on its award of damages.)

In *Laning–Harris Coal & Grain Co. v. St. Louis & San Francisco Ry. Co.*, 15 I.C.C. 37 (1909), a customer complained before the ICC that the defendant railroad had overcharged it by $42 on shipments made during

the period 1906–07. "In answer to the complaint defendant admitted that it is indebted to complainant in said sum, but shows that in 1902 and 1903 it undercharged the complainant in the sum of $109.50 [and] therefore claims set-off and asks dismissal of the complaint." *Id.* at 38. The Commission denied the set-off, explaining that:

> It is clear that the Commission ... is not authorized to adjudicate the claim of a railroad company against a shipper, but only the claim of a shipper against a railroad company.... To award set-off amounts to the same thing as adjudicating the claim of the railroad company against the shipper, and entry of an order based upon a set-off could occur only after such adjudication. Plainly, if the Commission is without authority to determine the rights of the parties, it is also powerless to enter an order based upon a determination of those rights.

Because the Congress borrowed heavily from the Interstate Commerce Act when it drafted the Communications Act of 1934—indeed the damage sections upon which the IXCs base their claims are derived from the ICA—both this court and the Commission often turn to decisions under the ICA for guidance in interpreting the Communications Act. *See, e.g., American Broadcasting Cos. v. F.C.C.,* 643 F.2d 818, 820–21 (D.C.Cir. 1980); *MCI Telecommunications Corp. v. AT & T,* 85 F.C.C.2d 994, 998 (1981). It is not surprising, therefore, that the Commission has expressly adopted the rule of *Laning–Harris. See Thornell Barnes Co. v. Illinois Bell Telephone Co., Decision,* Docket No. 14645, 1 F.C.C.2d 1247 (1965).

The customer in *Thornell Barnes* was seeking damages upon the ground that Illinois Bell had improperly charged him for misdirected calls. After calculating the customer's damages, the Commission stated:

> We do not believe ... that it would be proper to "set off" against this amount the amount that Barnes was undercharged on certain calls at the station-to-station rate because this would involve a determination of the carrier's rights against a subscriber, over which this Commission has no jurisdiction. *See Laning–Harris Coal & Grain*

*Co. v. St. L. & S.F. R.R. Co.,* 15 ICC 37 (1908).

*Id.* at 1275. The IXCs argue that both the ICC's decision in *Laning–Harris* and the FCC's decision in *Thornell Barnes* preclude the Commission from awarding the LECs limited offsets in the present cases. That, they contend, would "involve a determination of the carrier's rights against a [customer], over which this Commission has no jurisdiction."

The Commission attempts to distinguish *Thornell Barnes* on the ground that it involved a claim for "set-off" while the instant cases involve claims for "offsets." Truly; it explains that a set-off "involves the adjudication of a claim separate from the one advanced by the plaintiff" and argues that it "did not adjudicate, through the use of offsets or otherwise, any claims of any LEC against any customer." Rather, the Commission argues, it considered the offsets only in the course of determining the damages that the complainants actually incurred. That is appropriate, according to the Commission, because the "focus of [the IXCs'] complaints is not [the LECs'] individual interstate access rates *per se,* but the excessive earnings produced by these rates and their effect on [the IXCs]." *MCI Damages Order,* 8 F.C.C.R. at 1527. We are not persuaded by the Commission's attempted distinction.

First, while one may be able to construct a distinction between set-offs and offsets, *but see Steinmeyer v. Warner Consolidated Corp.,* 42 Cal.App.3d 515, 116 Cal.Rptr. 57, 59–60 (1974) (using the two terms interchangeably), the Commission itself blurred the line between the two (if two they be) in *Thornell Barnes.* Although the Commission there characterized the claim made by the carrier as a "set-off," it considered the claim only as part of its damage calculation. The Commission thus appears to have considered, and rejected as *ultra vires,* the very manner of proceeding that it now repackages and embraces as an offset, *viz.,* folding the carrier's undercharge for one service into its evaluation of the actual damage that the customer suffered by reason of being overcharged for another. The new approach is inconsistent not only with the Commission's own

precedent but also with the course that the ICC took in the aftermath of *Laning–Harris.* In *Breece Veneer Co. v. Chesapeake & Ohio Ry. Co.,* 182 I.C.C. 690 (1932), the ICC awarded a customer reparations in the amount it was overcharged on certain shipments even as it refused to consider that the customer had not paid the carrier at all for a different shipment of the same commodity. The ICC did not accept the contention (adopted by a lone dissenter) that the strictures of *Laning–Harris* could be avoided simply by reducing the damages that the customer receives upon its claim against the carrier by the amount of the carrier's claim against the customer. *Id.* at 692. In short, the Commission's attempt to justify its allowance of offsets here is contrary both to its own precedent and to the ICC's longstanding interpretation of the cognate provisions of the ICA.

But there is another problem with the Commission's approach: The award of an offset amounts to an implicit determination that the defendant LEC was entitled to earn more than the amount that it actually earned from the rates that it charged. Under the rate-of-return regime as the Commission promulgated it, however, a LEC enjoys no such entitlement, either for interstate access overall or for any individual type of access. Indeed in *NETCO* we noted with approval that the Commission had "declined to set minimum guaranteed rates of return for carriers," 826 F.2d at 1108–09, and nothing of which we are aware in any subsequent rulemaking proceeding suggests that the Commission has since changed course. The Commission may not now, in adjudicating an individual damage complaint, simply manufacture out of whole cloth such a minimum guarantee—here a guarantee that the LEC will earn for the offsetting service a rate of return no lower than the rate of return actually obtained plus the additional amount (up to the maximum allowed) necessary to offset overearnings on the service for which the IXC has made the claim to be offset.

The Commission attempts to justify this departure from its own regulatory scheme by explaining that "it is reasonable to inquire into [the IXC's] overall purchase of interstate access services" because the "focus of [each IXC's] complaints is not [the LECs'] individual interstate access rates *per se,* but the excessive earnings produced by these rates and their effect on [that IXC]." *MCI Damages Order,* 8 F.C.C.R. at 1527. That explanation begs the question whether "excessive earnings" from the provision of one service can be offset by earnings foregone in the provision of another service. Most of the IXCs' claims are category-specific; that is, they are not based upon the rate of return that the LEC earned overall from the provision of interstate access services but rather upon the rate of return that the LEC earned from the provision of a particular type of access service. The IXCs seek to recover money from the LECs for having done the very thing that the Commission, in setting category-specific rate-of-return prescriptions, sought to prohibit—namely, earning more than the maximum allowed from the provision of a particular service. The Commission cannot avoid the inconsistency between the regulatory scheme that it devised and its more recent implementation of that scheme by blaming the IXC for the manner in which it brought its claim, *i.e.,* for focusing upon the LEC's excessive earnings rather than the specific rate that it charged.

Finally, the Commission's approach to offsets is inconsistent with the statutory and regulatory goal of preventing discrimination in the pricing of access services. *See Prescription Reconsideration,* 59 Rad.Reg.2d at 1603 justifying category-specific rate-of-return prescriptions on ground that Commission is "bound by the Communications Act to ensure that rates ... do not produce unreasonable discrimination or undue preferences"; 47 U.S.C. § 202 ("It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges"). By awarding an offset in favor of a LEC the Commission effectively allows the complaining IXC alone to be charged for the offsetting category of service at a rate above what others paid for it, up to the rate that would yield the maximum rate of return for that type of service. An IXC that cannot or does not bring a refund claim in connection with its purchase of an overearning access service (X) will therefore pay less for the

**1420**

underearning category of service (Y) than will the IXC that does bring a successful refund claim. The Commission offers no convincing explanation of why an IXC that purchased little or none of the service (X) for which the LEC overearned (and hence did not bring an overcharge claim) should enjoy the low rate that the LEC charged for a service (such as Y) in which it underearned while an IXC that purchased more of the overpriced service should not.

In sum, by factoring into its damage calculation the complaining IXC's so-called "underpayments" for other categories of service, the Commission effectively adjudicates the defending LEC's claim for underearnings, in derogation of (1) FCC and related ICC precedent; (2) the Commission's rate-of-return regulatory regime, under which a LEC is not entitled to any minimum rate of return; and (3) the statutory and regulatory norms against rate discrimination. For all these reasons, we hold that the Commission's limited offset policy cannot stand.

### III. CONCLUSION

In summary, we deny the consolidated petitions of the LECs and the petition of Cincinnati Bell, and grant the consolidated petitions of the IXCs. The Commission's orders are therefore affirmed except to the extent that they involve limited offsets, as to which we vacate the Commission's orders and remand these matters for the Commission to recalculate the complainants' damages. We dismiss Allnet's petition as moot in view of our decision invalidating limited offsets.

*So ordered.*