SENTELLE, Circuit Judge,
concurring in part and dissenting in part.
In considering whether the plaintiff aggregators have standing to sue, I, like the Court, begin with the same basic question: “We must ... determine whether the aggregators have a stake in the outcome of the suit[.]” Maj. Op. at 1243. Because I conclude that most of the aggregators do not have a concrete private interest in the outcome of this suit, I must respectfully dissent from Part II.A of the Court’s opinion.*
The PSPs’ assignment of rights to APCC is materially limited: “ ‘[The PSP] hereby assigns, transfers, and sets over to [the aggregator] for purposes of collection all rights, title, and interest of [the PSP] in [the PSP’s] claims, demands or causes of action’ for dial-around compensation.” What the Court sees as “a mere reflection” of a technical detail not affecting the substance of the relationship, I see as the first clue that the PSPs, not the aggregators, would be the only plaintiffs with a real stake in the outcome of this controversy.
The Supreme Court’s statements on the “irreducible constitutional minimum” of standing, under Article III, are straightforward: first and foremost, the plaintiff “must have suffered an injury in fact — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical^]” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotation marks, footnote, and internal citation omitted). Of course, as this Court recognizes, the party that actually suffered the injury in the first instance need not be the party to bring suit; under Vermont Agency of Natural Resources v. United States ex rel. Stevens, an assignee of the injured party’s claim may have standing to sue. 529 U.S. 765, 771-74, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000).
The doctrine of assignee standing does not wholly erase the basic requirements of standing, however. There are “assignments,” and then there are assignments. Only an assignment that gives the assignee an actual interest in the recovery is sufficient for standing.
The assignee standing doctrine recognized by the Supreme Court (and cited by this Court, Maj. Op. at 1243) clearly refers to an actual assignment of an interest that secures a portion of the recovery. See Vermont Agency, 529 U.S. at 773, 120 S.Ct. 1858 (“The FCA can reasonably be regarded as effecting a partial assignment of the Government’s damages claim.”). The cases cited in Vetmont Agency as exemplifying “assignee standing” reflect this fact. See Poller v. Columbia Broadcasting System, Inc., 284 F.2d 599, 602 (D.C.Cir.1960), rev’d, 368 U.S. 464, 465, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (plaintiff in antitrust suit was assignee of all of the *92 assets of the dissolved corporation (of which he was previously the sole shareholder)); Hazeltine Research, Inc. v. Automatic Radio Mfg. Co., 77 F.Supp. 493, 495 (D.Mass.1948) (plaintiff in patent license suit was assignee of parent corporation’s right to grant licenses under certain patents), aff'd, 176 F.2d 799 (1st Cir.1949), aff'd, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950); Manhattan Trust Co. v. Sioux City & N.R. Co., 65 F. 559, 568 (N.D.Iowa 1895) (intervenor assignee in suit at equity was entitled to redeem securities pledged by assignor to third party, upon assignee’s payment of the loan proceeds to that third party), aff'd sub nom. Hubbard v. Tod, 76 F. 905 (8th Cir.1896), aff'd, 171 U.S. 474, 19 S.Ct. 14, 43 L.Ed. 246 (1898); Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 531, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) (plaintiff in contract dispute was subrogated pro tanto because, as injured party’s insurer, it had paid injured party compensation that it would recover in contract parties’ arbitration); Musick, Peeler & Garrett v. Employers Ins., 508 U.S. 286, 288, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993) (plaintiff in stock fraud suit was subrogated because, as injured party’s insurer, it had paid injured party compensation that it would recover in civil suit). See also Titus v. Wallick, 306 U.S. 282, 286, 59 S.Ct. 557, 83 L.Ed. 653 (1939), quoted in Maj. Op. at 1244 (plaintiff assignee did have to account for the proceeds of the recovery and turn over the proceeds to the assignor, but assignor was obligated, under the terms of the assignment, “after paying the expenses of collection, to pay over one-half of the net recovery to [assignee’s] wife, to discharge certain indebtedness of [assignee], and to pay the balance to [assignee].”).
The cases cited in Vermont Agency as exemplifying the accepted doctrine of “assignee standing” share a common characteristic noticeably absent from the case before us: in each of those cases the “assignment” gave the putative plaintiff a direct share in the recovery. This necessary characteristic renders those cases consistent with Vermont Agency’s requirement that the putative plaintiff have “a concrete private interest in the outcome of the suit” in order to attain standing. 529 U.S. at 772, 120 S.Ct. 1858 (quoting Lujan, 504 U.S. at 573, 112 S.Ct. 2130) (quotation marks & brackets omitted).
Under Vermont Agency (consistent with its foundation, Lujan), an assignee plaintiff must both (1) seek to vindicate the injury to the assignor, and (2) hold an interest “consisting] of obtaining compensation for, or preventing, the violation of a legally protected right.” Vermont Agency, 529 U.S. at 772-73, 120 S.Ct. 1858. An assignment suffices for such an interest when the assignee actually receives the benefit of the compensation he receives. Where the “assignment” relationship is in substance a mere “agency” relationship such that the “assignee” enjoys no right to keep a part of the recovery, the irreducible constitutional minimum of standing is left unsatisfied.
In this case, the putative plaintiffs themselves recognize that the PSPs’ assignment of rights to aggregators such as APCC gives them no share in the recovery. “The aggregators’ compensation for billing and collection services is based on the number of payphones and telephone lines operated by their PSP clients.” Br. for PlaintiffsAppellees at 5-6. The aggregators are a pass-through entity: “Aggregators are intermediaries between PSPs and IXCs for billing and collection. An aggregator ... collects the IXCs’ payments, and distributes those payments to its PSP clients.” Id. at 5.
*93 The contract cited by the Court reflects the pass-through nature of the “assigneeassignor” relationship. True, according to one part of the Agreement, the PSPs “assign[ ] ... for purposes of collection” the interest in Company’s claims. But we do not interpret the contract’s individual phrases apart from the rest of the contract; rather, we interpret the agreement “as a whole,” along with “all writings that are part of the same transaction.” See Restatement (Second) of Contracts § 202(2) (1979). Doubts raised by the “for purposes of collection” language of that portion of the contract are confirmed by the Amendment to APCC Services Agency Compensation Agreement, which notes that, far from taking on the rights and responsibilities of the PSPs en toto, APCC merely acts as the “PSP’s exclusive agent for■ billing and collection.” Amendment at 1 (emphasis added). APCC does nothing more than “tak[e] collective action on behalf of PSP and other[s] ... with similar claims.” Id. (emphasis added). APCC’s obligations to each PSP in this additional agreement stretch far beyond mere “obligatfion] to account for the proceeds of a suit brought on the claim.” Maj. Op. at 1244.
As noted above, APCC has no actual financial interest in the recovery. The Amendment confirms this. APCC’s compensation is determined by a schedule of variable fees determined by current PSP call volume, not the historical PSP call volume at issue in the case before us. APCC Services Agency Compensation .Agreement, Schedule A. See also San-dusky Memo (“To fund the suits, all plaintiffs are being required to agree to a quarterly assessment of their dial around compensation on a per call basis.”). True, if APCC’s collection efforts require APCC to provide “additional services ... over and above the services provided pursuant to the Agreement,” APCC could deduct costs (again, based on current call volume) from the PSPs’ recoveries, Amendment to APCC Services Agency Compensation Agreement at 2. But APCC has not alleged that such deductions are required in the present case, and we therefore have no occasion to determine whether such hypothetical deductions would be sufficient for standing.
The aggregators whose standing I find lacking advance an alternative theory that they have “associational standing.” Associational standing requires three elements: first, the association’s members must otherwise have standing to sue in their own right; second, the interest the association seeks to protect must be germane to its purpose; third, neither the claim asserted nor the relief requested must require the individual members to participate in the suit. Hunt v. Washington State Apple Advertising Comm’n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). The aggregators assert that they meet each requirement and therefore have associational standing. I disagree.
An aggregator cannot have “associational standing,” because an aggregator is not an “association.” The assignors of rights to the aggregators do not thereby become members of the aggregators. Indeed, the aggregators have no members at all. “In determining whether an organization that has no members in the traditional sense may nonetheless assert associational standing, the question is whether the organization is the functional equivalent of a traditional membership organization.” Fund Democracy, LLC v. SEC, 278 F.3d 21, 25 (D.C.Cir.2002). The aggregators are no such thing. APCC Seivices, Inc., Davel Communications Group, Inc., Data Net Systems, L.L.C., Intera Communications Corp., Jaroth, Inc., and NSC Telemanagement Corp. are all for-profit companies with contractual relationships with a *94 number of other companies. One corporation does not become a member of another corporation by reason of entering into contracts with it. The aggregators are in no sense “membership organizations.” They are not even “organizations.” They are incorporated entities-legal persons-and their clients are no more their “members” than a law firm’s clients are the firm’s “members.”
In sum, I would respond to the District Court’s cei'tified question for interlocutory appeal with instructions to dismiss the complaint with respect to the aggregators that do not own PSPs either in whole or in part. I therefore dissent, respectfully, from Part II.A of the opinion of the Court:
GINSBURG, Chief Judge, dissenting with respect to Section II.B.2 and to the judgment.
Because I believe the plaintiffs have a right to pursue their claims for dial-around compensation under 47 U.S.C. § 201(b), I would affirm the order of the district court on that ground.
Section 201(b) provides in relevant part: All charges, practices, classifications, and regulations for and in connection with [a] communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful .... The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.
Sections 206 and 207 afford a private right of action based upon conduct made unlawful by chapter 5 of the Act. Section 201(b), which is in chapter 5, makes unlawful any “unjust or unreasonable” practice in connection with a communication service. It is undisputed that both IXCs and PSPs provide a “communication service,” and that the Commission is charged with prescribing rules and regulations interpreting what is just and reasonable. See 47 U.S.C. § 201(b); AT & T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 378-79, 397, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). I agree with the plaintiffs that the IXCs’ failure to pay dial-around compensation constitutes an “unjust and unreasonable practice” as the agency has interpreted that phrase.
In rejecting the plaintiffs’ argument on that score, the court frames the question not as whether there is a private right of action under § 201(b), in conjunction with §§ 206 and 207, but where such an action is to be heard — in district court or before the Commission. According to the court, there is no indication “the Commission in 1999 ... even thought about suits directly in district court” to recover for a violation of the regulation, op. at 1247, and had the Commission made its intention known, “that would be another matter.” Id. at 1247 -1248. I disagree. It is not for the Commission to decide whether the plaintiffs may sue in federal court for a violation of the statute; the Congress has already made that determination. Section 207 provides that “any person claiming to be damaged by a common carrier[’s]” violation of Chapter 5 “may either make complaint to the Commission ... or may bring suit ... in any district court of the United States of competent jurisdiction.”
The PSPs allege the IXCs have violated § 201(b) by failing to pay the sums required by the dial-around compensation regulation. In promulgating that regulation the Commission invoked, in addition to § 276(b)(1)(A), its authority under §§ 201-205, see In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, 14 F.C.C.R. 2545 ¶ 232, 1999 WL 49817 (1999). In its 2003 Report and Order on the regulation, the *95 agency made express what had previously been implied, namely, that “failure to pay in accordance with the Commission’s payphone rules, such as the rules expressly requiring such payment that we adopt today, constitutes both a violation of section 276 and an unjust and unreasonable practice in violation of section 201(b) of the Act.” Pay Telephone Reclassification and Compensation Provisions, Report & Order, 18 F.C.C.R. 19975 ¶ 32, 2003 WL 22283556 (2003). That is clearly an authoritative interpretation of § 201(b). The court can say “[tjhere was no authoritative interpretation of § 201(b) in this case” only because it makes no mention of the 2003 Report and Order and fails to note that the Commission filed an amicus brief in this case advancing the same position. I disagree that the Commission has not exercised its interpretive authority in this case; the question, as I see it, I whether its interpretation is correct.
The IXCs and the court claim that, if § 201(b) applies here, then a common carrier’s violation of any regulation of the Commission could be said to constitute an unjust and unreasonable practice. I see no need to go so far, however, in order to uphold the agency’s interpretation of § 201(b) with respect to this regulation. Indeed, I would simply reiterate what this court said a decade ago, namely, that when the Commission reasonably deems the failure of a common earner to act in a specified way to be .an unjust and unreasonable practice, a carrier that fails to comply with the Commission’s prescription violates the Act. See MCI Telecomms. Corp. v. FCC, 59 F.3d 1407, 1414 (1995) (“We have repeatedly held that a rate-of-return .prescription has the force of law and that the Commission may therefore treat a violation of the prescription as a per se violation of the requirement of the Communications Act that a common carrier maintain ‘just and reasonable’ rates”). Contrary to the suggestion of the IXCs, Sandoval does not instruct otherwise. As the Court there explained, it is “meaningless to talk about a separate cause of action to enforce” a regulation that authoritatively construes a statute. 532 U.S. at 284, 121 S.Ct. 1511. “A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.” Id.
I find the IXCs’ other arguments for rejecting the Commission’s interpretation of § 201(b) equally unpersuasive. The IXCs. maintain that § 201(b) does not apply here because it “relates [only] to the common carriers’ provision of communication services to their customers,” but they do not even purport to ground that limitation in the text. Nor is there any precedent supporting such a limitation. On the contrary, both the Commission and this court have previously applied § 201(b) to one carrier’s provision of a communication service to another carrier. See MCI, 59 F.3d at 1414 (§ 201(b) makes unlawful carrier’s violation of agency regulation setting maximum rate-of-return for interstate access); Ascom Communications, Inc. v. Sprint Communications Co., 15 F.C.C.R. 3223, 2000 WL 135252 (2000) (§ 201(b) makes unlawful carrier’s attempt to collect from PSP for unauthorized and fraudulent calls placed from PSP’s phones over carrier’s network).
Sprint and AT & T next argue that § 201(b) applies only to the violation of a regulation, like the one at issue in MCI, promulgated exclusively pursuant to § 205 of the Act, which authorizes the Commission to set just and reasonable rates for services. I disagree — as does the Commission, which has invoked § 201(b) in several contexts to which § 205 does not pertain. See, e.g., Ascom, 15 F.C.C.R. at 3227 (“we conclude that Sprint violated section 201(b) when it charged Ascom for *96 certain calls for which Ascom was not a customer”); In re Telephone Number Portability, 18 F.C.C.R. 23697 n. 76, 2003 WL 22658207 (2003) (“we note that a violation of our number portability rules would constitute an unjust and unreasonable practice under § 201(b) of the Act”); Core Communications, Inc. v. SBC Communications Inc., 18 F.C.C.R. 7568 ¶ 25, 2003 WL 1884294 (2003) (failure to comply with merger conditions held an unjust an unreasonable practice). The IXCs offer no reason to believe the Commission may determine what constitutes an unjust or unreasonable practice only if, in doing so, it relies exclusively upon its authority under § 205. That limitation cannot be found in either § 201(b) or in § 205.
Having rejected each of the arguments raised by the IXCs, I see no reason to deem unreasonable the Commission’s determination that it is an unjust and unreasonable practice for a common carrier to fail to pay PSPs as required by the regulation. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Congress delegated to the Commission the responsibility of prescribing “such rules and regulations as may be necessary in the public interest to carry out the provisions” of the Act, 47 U.S.C. § 201(b), and then specifically directed the Commission to establish a compensation plan that “fairly compensates” PSPs for dial-around calls. 47 U.S.C. § 276(b)(1)(A). The .agency in turn set a rate for dial-around compensation that it believed to be “fair to both payphone owners and the beneficiaries of those calls” and to serve the public interest by ensuring “the widespread deployment of payphones.” 14 F.C.C.R. 2545 ¶ 59. This court upheld the Commission’s reasoning, so the justness and reasonableness of the rates is no longer open to challenge. See APCC v. FCC, 215 F.3d at 52. One would therefore be hard-pressed to say the Commission acted unreasonably when it deemed a common carrier’s failure to pay just and reasonable compensation an unjust and unreasonable practice. See Capital Network Sys., Inc. v. FCC, 28 F.3d 201, 204 (D.C.Cir.1994) (“Congress entrusted the administration of the Communications Act to the FCC .... Because ‘just,’ ‘unjust,’ ‘reasonable,’ and ‘unreasonable’ are ambiguous statutory terms, this court owes substantial deference to the interpretation the Commission accords them”).
Accordingly, I would hold the plaintiffs may sue the defendant IXCs under § 201(b) for failure to comply with the Commission’s regulation governing dial-around compensation, and would affirm the district court’s order on that basis.

 As noled by the Court, Maj. Op. at 1242 n. **, this discussion only applies to those plaintiff aggregators that do not own, wholly or in part, PSPs.